## FISH v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. July 10, 1914. Rehearing Denied August 11, 1914.)

### No. 1065.

1. CRIMINAL LAW (§ 369*)—EVIDENCE—EVIDENCE TENDING TO PROVE PRIOR OFFENSES.

Where, in the trial of a defendant charged with having burned a yacht of which he was owner with intent to prejudice the insurer, the only doubtful question was whether the fire which burned the yacht was set by defendant, it was error to admit evidence that during the preceding 14 months an automobile and another yacht owned by him had been burned, that both were overinsured, and that defendant was heavily in debt and without money, and was in each case the first to discover the fire, but made no attempt to save the property; the only tendency of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

such evidence being to prove the commission of crimes by defendant in the other cases, which in the instant case was incompetent.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 822–824; Dec. Dig. § 369.*]

2. CRIMINAL LAW (§ 1171*)—MISCONDUCT OF DISTRICT ATTORNEY—COMMENTS ON CHARACTER OF ACCUSED.

Remarks made by a district attorney in his argument to the jury, reflecting upon the defendant's character, which was not put in issue, and going beyond any evidence in the case, and which were not withdrawn or corrected when called to the attention of the court and counsel, *held* to constitute prejudicial error.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3126, 3127; Dec. Dig. § 1171.*]

In Error to the District Court of the United States for the District of Massachusetts; Clarence Hale, Judge.

Criminal prosecution by the United States against John A. Fish. Judgment of conviction, and defendant brings error. Reversed.

William H. Lewis, of Boston, Mass., for plaintiff in error.

Asa P. French, U. S. Atty., of Boston, Mass. (James S. Allen, Jr., of Boston, Mass., on the brief), for the United States.

Before PUTNAM, DODGE, and BINGHAM, Circuit Judges.

BINGHAM, Circuit Judge. The plaintiff in error, hereinafter called the defendant, was indicted in the District Court of the United States for the District of Massachusetts for willfully and corruptly burning and destroying an auxiliary gasoline schooner yacht called the Senta, of which he was the sole owner, on October 25, 1910, in Edgartown Harbor, Mass., upon waters within the admiralty and maritime jurisdiction of the United States, with intent thereby to prejudice the underwriters who had insured the yacht. The provisions of law under which the indictment was framed will be found in section 300 of the Criminal Code of the United States (Act March 4, 1909, c. 321, 35 Stat. 1147 [U. S. Comp. St. Supp. 1911, p. 1678]; R. S. U. S. § 5365 [U. S. Comp. St. 1901, p. 3641]). The jury returned a verdict of guilty. The case is now here on the defendant's bill of exceptions, and the errors assigned are: (1) To the reception of evidence relating to two fires other than the one charged in the indictment; (2) to the admission of certain other evidence; (3) to the argument of the district attorney; and (4) to the refusal of the court to give certain instructions.

The evidence tended to show that the yacht, which for convenience will hereafter be spoken of as the second Senta, was destroyed by fire between 2 and 3 o'clock on the morning of October 25, 1910, while at anchor in Edgartown Harbor, and within a few hundred yards of the shore; that the defendant was then on a pleasure cruise, and had come into the harbor some two or three days before, and had with him a cousin by marriage, Mrs. Williams, a friend, Miss Barnes, and a crew consisting of a sailing master and three men; that on the afternoon of October 24th the defendant went ashore in Edgartown, and while there at that time, or a day or so before, became acquainted with two men,

Osborn, a local ferryman, and Dexter, a member of the state police, both of whom he invited to dinner that evening on the yacht; that Osborn and Dexter came to the dinner, and while they were there the defendant arranged a gunning trip with Dexter, upon which they were to start at an early hour the next morning; that Dexter and Osborn went ashore somewhere between 8 and 10 o'clock; that the ladies concluded to retire about 10:30, but before doing so requested the defendant to light the oil stove, which was in the cabin, so that they might warm their feet; that, after warming themselves for a short time, they retired to the stateroom they were to occupy that night, which was situated on the starboard side and forward of the main cabin; that as they did this the defendant, who was in the aft stateroom, on the port side and forward of the main cabin, called out to them not to turn out the stove, as he wanted to come out and write some letters; that when they left the cabin the stove was about halfway between their stateroom and the dining table, the distance between the end of the table when extended and the partition to their room being five or six feet; that the table was not extended when they retired, and the stove was several feet away from it; that the stove was then burning and not smoking; that previous to this night Mrs. Williams had occupied the stateroom which the defendant was occupying, but on this night she slept with Miss Barnes, who was the regular occupant of the stateroom on the starboard side; that this change was made at the defendant's request, he stating that possibly one of the guests would stay aboard, but neither of them did, and neither was invited; that before this the defendant had slept in the transom berth in the main cabin; that after the ladies had gone to sleep, and between 2 and 3 o'clock in the morning, they were awakened by the defendant, who opened their door, saying, "Get out as quick as you can;" that they both arose, Mrs. Williams going at once, without stopping to dress, into the cabin, where she met the defendant near the door of his stateroom, holding her coat, which he helped her to put on; that at the defendant's direction she passed through the cabin, up the companionway to the deck, and went forward; that her coat was usually kept in the companionway, which was at the rear end of the cabin and opposite the door of the defendant's stateroom; that as she passed through the cabin she saw, and smelled, smoke, but observed no flame; that she passed within two feet of the stove, which was where they had left it the night before, and there was a dark object—cloth, she thought, thrown over the top of it; that the captain, who occupied the stateroom on the port side, forward of the one occupied that night by the defendant, was awakened by hearing the ladies' voices; that he went on deck as soon as he could, reaching there shortly after Mrs. Williams; that either before or after going on deck he learned from the defendant that something was the matter with the oil stove, and was directed to look out for the ladies and call the crew, which he did at once; that after getting on deck, and while speaking to the defendant through one of the skylights, he smelled smoke, but saw none; that Miss Barnes came on deck about three minutes after Mrs. Williams; that before Miss Barnes came on deck flames were seen emerging from the portholes on the starboard side; that the captain and the ladies got into the launch, the

captain remaining in it until the launchmen got in and hauled it up to the bow and around to the port side, when he boarded the skiff, which lay on that side; that while the launch was passing under the bow, and before the defendant appeared, flames were seen coming out of the companionway and the skylight; that later, and about 8 or 10 minutes after Miss Barnes reached deck, the defendant came on deck from out the forward galley; that about five or six minutes before the defendant came on deck, and after the launch had reached the port side of the yacht, an explosion was heard, "a fairly loud, muffled explosion"; that when the defendant came on deck he had a bundle and two guns with him, and at once got into the launch, and all went ashore; that neither the captain nor any of the crew went below after going on deck; that the defendant was the only one below after Miss Barnes came on deck; that the defendant at no time called for assistance, and no attempt was made to put out the fire; that just aft of the cabin were tanks containing several hundred gallons of gasoline; that there were on board tanks containing several hundred gallons of water, some buckets, and means provided for admitting salt water to the bathtub; that after getting on shore the defendant stated, in explanation of the fire, that he was awakened between 2 and 3 o'clock, and found the cabin full of smoke, and the tablecloth and the partition on fire; that he threw a blanket over the kerosene stove, which was burning, and called the captain and the ladies; that he thought the kerosene stove set the fire; that while he was in the stateroom getting his guns there was an explosion which knocked down the partition of the stateroom, striking him.

It also appeared in evidence that on October 8, 1910, the defendant shipped from the yacht to his address in New York three boxes and a bag, the aggregate weight of which was 215 pounds; that two days before the fire a box weighing 65 pounds was brought ashore from the yacht, which contained clean bed and table linen and other things, which the defendant himself had packed; that this box was shipped in Osborn's name, addressed to Miss Barnes, New York; and that subsequent to being indicted the defendant said to Mrs. Williams that he did not see how he could be convicted, as no one saw him set the fire.

As bearing on the question that the defendant and no one else had a motive to set the fire, and that it was intentionally set by the defendant, it further appeared that two days before the fire the defendant made the remark that he wished some one would show him how to raise some money; that at the time of the fire he had insurance on the yacht for $15,000; that while the cost of the yacht ($1,500), plus the repairs ($4,700), made it stand him at a little rising $6,000, it was only worth about $3,800, and consequently was largely over-insured; that he had come into no property other than what he received from a wife who died in 1904, and that he disposed of that in one way or another shortly after she died; that subsequent to that time, and during a part of 1906 and 1907, he worked in a store for $20 a week, and after that, through his association with a firm of insurance brokers, had earned from $500 to $1,000 a year; that he received a pension of $45 a month; that by reason of loans obtained from Miss Barnes he was indebted to her in the sum of from $12,000 to $15,000; that he had an account

with only one bank in New York, at which his balance on October 25, 1910, the date of the fire, was $42.58, and on the day following the fire, being out of funds, he borrowed $400 from Osborn, $300 of which he failed to repay; that immediately after the fire he applied for the insurance, but the underwriters declined to pay it.

[1] Subject to the defendant's objection and exception, assigning specific reasons, and under agreement that the objection and exception should be held to relate to every portion of the testimony and to every use made of it, the government was allowed to introduce testimony concerning the burning of a yacht owned by the defendant, and hereinafter called the first Senta, that was burned on October 1, 1909, and as to the burning of an automobile, owned by the defendant, that was burned on September 3, 1910, to show that the burning of the second Senta was not accidental, but designed.

The evidence as to the first Senta was substantially as follows: That the defendant bought the yacht May 20, 1908, for $300; that on October 1, 1909, she took fire, and was a total loss; that when she took fire she lay at anchor near the coast of Connecticut; that the hour was about 3:30 in the morning; that the defendant was on board, and then had insurance on the yacht in the Lloyds of London for $15,000, which he subsequently collected; that he was practically out of funds at the time, having a balance of only $4.59 in his New York bank; that he was heavily indebted; that all on board except the defendant were asleep when the fire broke out; that he was the first to discover the fire; and that no effort was made to put it out.

As to the automobile, the evidence was: That March 3, 1909, the defendant obtained by barter a Rainier automobile, giving for it some paintings and bric-a-brac; that on September 3, 1910, at about 9 o'clock, on a rainy evening, while the automobile was standing in a closed barn belonging to his cousin, whom he was visiting in Connecticut, the defendant and Miss Barnes being the only persons about the premises, an explosion occurred, and the automobile and barn were burned; that a short time before the defendant had suggested to his cousin that he procure a permit from the insurer of the barn to keep an automobile there, although it had been previously kept there at various times without a permit, and that a permit was procured; that at the time of the fire the automobile was worth about $1,500; and that he had $3,500 of insurance in the Hartford Fire Insurance Company at Hartford, which he subsequently collected; that he was without funds, and largely indebted, his bank account at the time showing a balance of only $1.77.

A consideration of the evidence that relates strictly to the fire of October 25, 1910, to the second Senta, leads one to the conclusion that the doubtful question as to which the jury was called upon to decide was not whether the fire was accidentally set, but whether the defendant set it; that, if it were established that the defendant set the fire, there could be no doubt that the act of setting it was not accidental, but intentional, and was done for the purpose of prejudicing the underwriters and replenishing the defendant's depleted and empty pockets. He had procured insurance upon the yacht exceeding its value by about $11,000. He was without funds to meet his bills

and pursue a life of ease, which he apparently was desirous of leading; and he had said a day or so before the fire that he wished some one would show him how to raise some money. In this frame of mind, and to avoid possible complications in the execution of his plan, he changed his sleeping place on the yacht the night of the fire, under the pretext that Osborn or Davis would remain on board, when neither of them was invited to remain. He arranged a hunting trip for the early morning, so that no one would be alarmed if they were disturbed by noises at an unseasonable hour. He threw a blanket over the oil stove to impair its draft, so that it would smoke and create a basis for his alarm of fire when he should arouse the ladies and send them on deck. Having aroused the ladies, he directed the captain to go on deck, call the crew, and attend to the ladies. He at no time called for assistance. He stated after reaching shore that the tablecloth and the partition of the cabin caught on fire from the oil stove, although the tablecloth and the partition were not near the stove, and there was no fire in the cabin at the time Mrs. Williams passed through it to go on deck. And he remained below for some 10 minutes after Mrs. Williams went on deck, during which time an explosion took place and flames were seen to come from the cabin.

Such being the state of the proof negativing any idea that the fire might be accidental, we are of the opinion that this was not a case where evidence of previous fires should have been received for this purpose. Evidence of this character necessitates the trial of matters collateral to the main issue, is exceedingly prejudicial, is subject to being misused, and should be received, if at all, only in a plain case. People v. Sharp, 107 N. Y. 427, 469, 14 N. E. 319, 1 Am. St. Rep. 851; State v. Lapage, 57 N. H. 245, 295, 24 Am. Rep. 69. But, if this is not a correct view of the law as applied to the facts in this case, the question is whether all the evidence that was introduced as to the previous fires was legally relevant upon the issue to which the court limited its use, and, if some of it was not, whether that portion was harmless or prejudicial. As above stated, the defendant's exception is to all the evidence, to every portion of it, and to every use made of it, and the special reasons assigned are:

"(1) The fact that a man has committed one crime has no tendency to show that he has committed another crime.

"(2) The admission of this evidence makes it necessary for the defendant to meet in one trial evidence as to several distinct, separate crimes.

"(3) The evidence offered has no probative force.

"(4) The evidence offered has no probative force except coupled with a finding by the jury that the defendant set the previous fires.

"(5) The circumstances of the previous fires are not sufficiently related in point of time and similarity to have probative force."

Upon the admissibility and use of this evidence the court instructed the jury as follows:

"Now, in order to show that the fire was incendiary, and not accidental, I have permitted certain evidence to be received about other fires. Now, this does not impose upon the jury the duty of trying the defendant for these other fires. It is not offered, and it could not be offered, for the purpose of showing that he had burned the first Senta, and that he had burned an automobile, and therefore that you might more readily be induced to the belief that

he burned this yacht. That is not the purpose of this evidence, and that is not what it is offered for, or what it could be admitted for. It is for the purpose of showing that the fire was not accidental, but was incendiary. * * * The government is not bound to prove, and has not undertaken to prove, that the defendant set fire to the first yacht Senta, or to his automobile. If you are satisfied that those fires occurred, you may use that fact, and the fact of any condition or circumstance attending or surrounding either or both of them, similar to any which you find existed with the fire charged in the indictment, to assist you in determining an important question in this case, namely, Was the fire charged in the indictment accidental or intentional? That is to say, Was it accidental or incendiary? The only question to which you can properly apply the evidence offered as to the two preceding fires is: Is it probable or improbable that these fires should occur to property of the defendant within the space of 13 or 14 months under somewhat similar circumstances (if you find them to be similar), and yet all be accidental? And it is on this question of whether or not those fires were accidental that I have allowed the government to show the similarity of circumstances, the fact of overinsurance, alleged overinsurance in the past cases, the fact of his condition of finances, and various other facts which the government claims to have been similar, and which the government claims to be circumstances which should induce the minds of the jurors with great directness to find that this fire was not an accidental fire, but was an incendiary fire."

It is thus seen that the court told the jury they might use the fact of overinsurance, in the case of the first yacht and of the automobile; that they might use the fact of the defendant's financial condition at the respective times these two fires occurred; and that they might use any of the other facts—some of which were that the defendant had his cousin, shortly before the fire to the automobile and the barn, procure a permit from the insurers of the barn to keep the automobile in it; that the defendant was the first person to discover the fire on the first Senta and the last person to come on deck, and then only after an explosion had taken place; and that he was the first person to discover the fire to the automobile, and shortly after the fire broke out was found at the telephone, either pretending he was giving a warning, or undertaking to prevent others from giving one—in determining whether the fire to the second Senta was accidental or incendiary.

The pertinent inquiry which suggests itself on reading these instructions is, What possible relevancy had any of these facts upon any question other than the very one on which the court instructed the jury that they could not consider them, namely, that the defendant set the fire to the first Senta and the automobile for the purpose of obtaining the insurance, and, having shown him to have committed those crimes, to more readily induce the jury to find that he committed the crime charged in the indictment? The fact that he overinsured the first Senta and the automobile had no probative value upon the question whether the second Senta was burned accidentally or intentionally. It no doubt has probative force for the purpose of showing the defendant set the fires to the first Senta and the automobile, but not that he intentionally set fire to the second Senta. Then, again, does the fact that the defendant had his cousin obtain a permit to keep the automobile in the barn lead one's mind, by any logical process of reasoning, to the conclusion that the fire to the second Senta was intentionally set? It is apparent that it does not. These facts, and others of like import, are undoubtedly relevant upon the question of who was the

responsible agency for those fires; they do not, however, as the government contends, show that an indefinite somebody set them, but suggest, if anything, that the defendant set them, and that he set them intentionally. If the evidence disclosing the defendant's possible connection with the setting of the fires to the first Senta and the automobile were eliminated from the case, the question would be presented whether proof of the occurrence of three fires, within a period of 14 months, to property owned by the defendant, on which he had insurance, is of any probative value on the question whether the third fire was accidental or designed. If it can be said that such evidence may reasonably and logically lead one's mind to the conclusion that the third fire was designed, and that the conclusion involves something more than mere guesswork, it is a sufficient answer to the contention of the government that the evidence which it was allowed to introduce was not thus limited; and, some of it being irrelevant and prejudicial, the defendant's exceptions should be sustained. In Regina v. Gray, 4 F. & F. 1102, a case much relied upon by the government in support of its contention, the evidence received of previous fires was of a limited nature. In that case it simply appeared that other houses in which the defendant had lived, and on which he had insurance, were destroyed by fire. There was no evidence allowed to be introduced as to the nature of the fires, their cause, the number of persons present at the time, that the defendant was near the houses or even in England when the fires took place, nor that the houses were overinsured, nor that the defendant was without money to meet his wants. This is as far as any court has gone in the reception of evidence of previous fires upon the question of accident or design, and falls far short of meeting the claim of the government for the admission of the evidence received in this case. The case of Regina v. Gray, supra, is a nisi prius case. It has been questioned by Sir James Fitzjames Stephen, in his Digest of the Law of Evidence (Stephen's Dig., Chase [2d Ed.] p. 51, n. 1), and has not been generally followed in this country.

While there are exceptions to the general rule—that on the trial of a person for one crime evidence that he has been guilty of other crimes is irrelevant—it is not to be understood that any of the exceptions, when rightly applied, go to the extent of sanctioning the idea that a defendant's propensity to commit crime, or to commit crimes of the same sort as the one charged, can be put in evidence to prove him guilty of the particular offense; and that to come within the exceptions there must be some other real connection between the extraneous crime and the crime charged. As said by Judge Dixon in State v. Raymond, 53 N. J. Law, 265, 21 Atl. 330:

"However reasonable would be the deduction that, when a pocket is picked in a group of persons, of whom only one is addicted to picking pockets, he is the offender, his singularity in this respect could not, under our legal theory, figure as proof of his guilt. There must appear, between the extraneous crime offered in evidence and the crime of which the defendant is accused, some other real connection, beyond the allegation that they have both sprung from the same vicious disposition."

This is the rule that is generally followed in this country, and that prevails in Massachusetts and in the federal courts, as will be seen from

an examination of the following cases: Boyd v. United States, 142 U. S. 454, 12 Sup. Ct. 292, 35 L. Ed. 1077; Thompson v. United States, 144 Fed. 14, 18, 19, 75 C. C. A. 172, 7 Ann. Cas. 62; Marshall v. United States, 197 Fed. 511, 117 C. C. A. 65; Commonwealth v. Jackson, 132 Mass. 16; Commonwealth v. Bradford, 126 Mass. 42; Commonwealth v. McCarthy, 119 Mass. 354; Commonwealth v. Robinson, 146 Mass. 571, 579, 16 N. E. 452; State v. Sharp, 107 N. Y. 427, 466, 14 N. E. 319, 1 Am. St. Rep. 851; People v. Fitzgerald, 156 N. Y. 253, 261, 50 N. E. 846.

[2] We have examined the other exceptions relied upon by the defendant, and find that most of them relate to questions that are not likely to arise at another trial. We, therefore, pass them by, except the one relating to the argument of counsel. In his closing argument counsel for the government said:

"To the time of the fire in Edgartown Harbor he [Fish] had been living on the proceeds of fire insurance, eked out by loans from a woman whom he had made his dupe and his prey, who had given herself up to him, and intrusted herself and her property to him without a scrap of paper to show for it, * * * a woman with whom he had been on intimate terms for 10 years, to whom he owed from $12,000 to $15,000 at the time of this fire, yet, though there seems to be no legal impediment, he has never made her his wife. Gentlemen, is there much lower degradation than that of a man who lives in this way upon a woman?"

We are of the opinion that the district attorney, in saying what he did, departed from the evidence and issues in the case. The defendant's character was not put in issue; and the attempt on the part of counsel for the prosecution to have the jury believe that the defendant's relations with Miss Barnes were not above suspicion, but were base and immoral, was without evidence for its support, and was an appeal to the passion and prejudice of the jury. Immediately upon the statement being made counsel for the defendant objected, and brought the matter to the attention of the court and of counsel for the prosecution. It then became the duty of the district attorney to withdraw the statement and ask the jury to disregard it; and the court should at that time have instructed the jury that the statement was improper, and that they should not allow it to influence their action. The district attorney did not withdraw the statement, but replied that it "was not necessary for him to impugn Miss Barnes' virtue," and then added that he was talking "only about the financial aspect of their relations." The objectionable statement being allowed to stand, defendant's counsel followed it up with an exception. The objection and exception were seasonably and properly taken. Odell Manufacturing Co. v. Tibbetts, 212 Fed. (June 4, 1914) 652, 655, 129 C. C. A. 188.

The judgment of the District Court is reversed, the verdict is set aside, and the case is remanded to that court for further proceedings not inconsistent with this opinion.