## SEARS v. UNITED STATES (three cases).

(Circuit Court of Appeals, First Circuit. March 23, 1920.)

Nos. 1447–1449.

1. **Bribery ⊗⟞1(2)—Inspectors "performing an official function" held to be government officers.**

    Inspectors placed by authority of the War Department in the plant of a contractor for the manufacture of army shoes to make preliminary inspection of material used, in an advisory capacity, pursuant to the terms of the contract, and governed as to their duties by regulations of the department, *held* performing an official function for the United States, within Penal Code, § 39 (Comp. St. § 10203), making bribery of such persons an offense, although the shoes were subject to final inspection before acceptance.

2. **Criminal law ⊗⟞371(12)—Evidence of other offenses competent on question of intent.**

    On trial of defendant on an indictment charging him with defrauding the government, by using in the manufacture of army shoes inner and outer soles not of the quality called for by the contract, evidence that he also knowingly used bad middle soles *held* competent on the question of intent.

3. **Criminal law ⊗⟞1168(3)—Harmless error in failing to swear witnesses.**

    That two government witnesses were not sworn before testifying *held* not reversible error, where the facts to which they testified were subsequently in substance testified to by defendant.

4. **Criminal law ⊗⟞1134(4)—Denial of new trial not reviewable.**

    The denial of a motion for new trial in a criminal case by a federal court is not, except under unusual circumstances, reviewable by the appellate court.

5. **Conspiracy ⊗⟞45—Testimony to facts too remote held incompetent.**

    In a prosecution for conspiracy to defraud the United States and to bribe government inspectors, testimony that in a quantity of shoe soles purchased from a concern was found a large percentage of soles of a better grade than those bought *held* properly excluded, as too remote, when offered to establish the presumption that a quantity purchased from the same concern a year before, when market conditions were different, also contained such percentage of the higher quality.

6. **Conspiracy ⊗⟞48—Instructions approved.**

    In a trial for conspiracy to defraud the United States and to bribe government officers or agents, instructions *held* correct and to fully protect defendant's rights.

7. **Words and phrases—"Iron."**

    The word "iron," when used as a measurement for shoe soles, means $1/48$ of an inch in thickness.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Iron.]

In Error to the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Criminal prosecutions by the United States against Frank I. Sears. Judgments of conviction, and defendant brings error. Affirmed.

Charles F. Choate, Jr., of Boston, Mass. (William H. Garland, of Boston, Mass., on the brief), for plaintiff in error.

Lewis Goldberg, Asst. U. S. Atty., of Boston, Mass. (Thomas J.

Boynton, U. S. Atty., of Boston, Mass., on the brief), for the United States.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. The defendant, Sears, was convicted under three indictments charging him jointly with one Sherwood with conspiracy to defraud the United States and to bribe two government inspectors, Smith and Honen.

The three cases were tried together. On the day of the trial, Sherwood retracted his former plea of not guilty and pleaded guilty to each of the three conspiracy indictments. The two inspectors, Smith and Honen, who were also separately indicted for receiving the bribes alleged to have been given by Sears and Sherwood, were not put to trial, but were called by the government as witnesses at the trial of the defendant Sears.

Sears was sentenced to imprisonment in the House of Correction at Greenfield for a term of one year and one day on each of the three indictments, the sentences to run concurrently.

The alleged fraud and bribery took place with relation to the performance by A. J. Bates Company of a contract with the government dated October 13, 1917, for the manufacture and delivery to the United States of 114,000 pairs of shoes for army use. Sears was vice president and general manager of the Bates Company. He signed this contract and was familiar with its elaborate and minute specifications in respect to the kind and quality of the materials to be used in the manufacture of the shoes. Sherwood had been in the employ of the Bates Company over 20 years, during the last 7 of which he was foreman of the sole leather room and assistant to Sears in purchasing sole leather. Smith and Honen were government inspectors placed in the Bates plant in order to inspect the shoes while in the process of manufacture and to reject any materials or workmanship not conforming to the requirements of the contract; such action, however, was in an advisory capacity only; final inspection was made at the time and place of delivery.

[7] The indictment for conspiracy to defraud the United States charged in substance that Sears and Sherwood conspired to buy and use outer and inner soles inferior to those called for by the contract. The contract called for outer soles of a thickness of 9 iron. "Iron" means $1/48$ of an inch in thickness. About the time the contract for these shoes was placed, in October, 1917, the defendant Sears instructed Sherwood to purchase, and Sherwood did purchase, a large quantity of outer soles graded as $8\frac{1}{2}$ iron outer soles.

These outer soles were purchased at an average price of about 65 cents. There was evidence tending to show that the average market price of 9-iron soles at that time was about 75 or 76 cents. Sears himself put the market price at about 72 cents. There was also evidence tending to show that a large part of the $8\frac{1}{2}$-iron outer soles thus purchased were used in manufacturing the shoes called for by the government contract. There was also evidence that in October, 1917, Sher-

wood, under instructions from Sears, bought inner soles of a lower grade than that required by the contract, at prices ranging from 15½ to 17 cents per pair, whereas inner soles of the contract grade had at that time a market price of about 25 cents per pair.

The defendant, who testified in his own behalf, admitted the purchase of the 8½-iron soles, but contended in effect that at the time of this purchase the market had been stripped of 9-iron outer soles, because the government had contracted for large quantities of shoes specifying 9-iron soles; that he purchased in the aggregate some 200,000 pairs of outer soles graded at 8½-iron, expecting therefrom to cull enough 9-iron soles to enable his company thus substantially to perform its contract with the government, using the balance of thinner soles on shoes intended for civilian use.

There was little dispute as to the facts concerning the payment of money to the inspectors. Frank Smith was inspector at the Bates Company factory of outer soles and inner soles and sole leather from some time in the fall of 1917 until about April, 1918. There was evidence that about November 17, 1917, the defendant Sears told Sherwood that Smith was a pretty good old scout and had not caused much trouble, and that he (Sears) was going to make Smith a little present, and desired Sherwood to give it to him. Sherwood said that he did not—

" 'like the idea. I don't want to do it.' Sears replied, 'What, have you got cold feet?' I replied, 'No.' He said, 'Do you know what they would do with you, if they had you in the army?' I said, 'No;' and he said, They would take you out and shoot you.' He said, 'You come with me;' and I went. He took me into the office to the cashier's desk. He went up and spoke with Miss Hawley, or he said—I don't know just what he said, but Miss Hawley got some money and a yellow slip which they call a voucher. The yellow slip was handed over to me, and I was requested to sign it. I signed the yellow slip—put my name on it, and I was handed $50, which I took in to Mr. Smith. As soon as I got the money, Mr. Sears left and went into his office."

That he gave Smith the money. That about a week before Christmas Sherwood had another talk with Sears, in which Sears said:

" 'Tom, it is pretty near Christmas, and I want to make Smith a Christmas present, and I want you to hand it to him, and you come over to Miss Hawley and get the money.' We went in to Miss Hawley and got $50, and I signed a yellow slip, took the money, and gave it to Smith as a Christmas present."

There was evidence of other similar gifts to Smith, making an aggregate of $190 in all.

Honen was also an inspector of sole leather who came to the factory in the fall of 1917 and remained until some time in the spring of 1918. Sherwood testified in effect that shortly before Christmas, 1917, he had a conversation with the defendant Sears concerning Honen, in which Sears said in effect that Honen "has not used us very good. He hasn't given us anything. Perhaps if we give him a little Christmas present it will sweeten him up." "I am going to make him a little present and a little later on I will give him more." Accordingly, Sears took Sherwood into the office, got $25 from the cashier, and Sherwood gave the money to Honen. Two other similar gifts were made, making an aggregate of $75 given Honen. While it is not in dispute that such

payments were made to Inspectors Smith and Honen, and charged to profit and loss, the defendant says that the suggestion of making presents to the inspectors originated with Sherwood, and that Sherwood said it was to be in lieu of an allowance which might otherwise be made to these inspectors if transferred to some other factory.

From the foregoing it appears that there was no dispute that Sears and Sherwood intended to buy, and did buy, outer soles graded as 8½-iron for use in manufacturing army shoes under specifications which called for 9-iron outer soles, and also bought and used inner soles on the same contract of a grade lower than that called for by the specifications, and that money was paid to the government inspectors as charged in the indictments. There was, therefore, except in minor particulars, no dispute as to the basic facts. The case turned upon the interpretation to be put by the jury upon these facts and upon the intent of the defendant.

Other facts of minor importance will be hereafter referred to in dealing with the assignments of error.

[1] (1) Learned counsel for the defendant urges as the defendant's chief reliance an alleged error arising under the twenty-eighth assignment. This, in effect, is that under the indictments for bribing the inspectors the court should have ordered verdicts for the defendant, on the ground that these inspectors were not, as matter of law, exercising official functions within the meaning of section 39 of the Penal Code (Comp. St. § 10203). Defendant contends that the right and duty of these inspectors to inspect were created only by the contract between the government and the Bates Company, and that the inspectors were therefore not exercising official functions.

It is true that the contract provides that the government—

"shall have the right at any time to inspect in the manner deemed necessary, by duly authorized officer or agent, the articles in process of manufacture and to reject any materials or workmanship not conforming to requirements; the action of such inspector to be in an advisory capacity only, the final inspection to be made at the place where delivery is required."

Also that in a later clause the contract provides for final inspection as soon as practicable after delivery, at which time the shoes were to be either accepted or rejected.

But defendant's counsel have fallen into serious error in assuming that the contract is the only basis for the presence and activity of these inspectors in the factory of the Bates Company. The relations between the government and the Bates Company in time of war were quite other than those which accrue between private parties out of ordinary contracts. If the Bates Company had declined to contract with the government on terms satisfactory to its representatives, the government might have taken possession of and operated the factory under the provisions of the National Defense Act of June 3, 1916, c. 134, § 120, Barnes' Federal Code, § 10151 (Comp. St. §§ 3115f–3115h).

Moreover, it appears that there are elaborate regulations as to inspectors promulgated by the direction of the Secretary of War appearing in the Manual for the Quartermaster Corps of the United States Army, vol. 1, published in 1916. Of these we must take judicial

notice. Caha v. United States, 152 U. S. 211, 221, 14 Sup. Ct. 513, 38 L. Ed. 415; Jones v. United States, 137 U. S. 202, 212–215, 11 Sup. Ct. 80, 34 L. Ed. 691. Under section 171 of this Manual there is a provision including inspectors of shoes in the classified service coming within the operations of the Civil Service Act (22 Stat. 403). Sections 182 and 1115 provide, inter alia, for taking the oath of office. Section 977 provides in effect that raw material used in government work shall be "as frequently inspected as the United States government may require by inspectors especially qualified for such work." Circular No. 5 issued from the Quartermaster's Department under date of March 10, 1915, contains detailed and specific instruction as to the inspection of shoes, requiring, inter alia, that at least two inspectors should be maintained at shoe factories where all the materials are assembled and the goods constructed, and that "the utmost care and closest scrutiny is necessary to prevent unsatisfactory results even at the factories of the most willing and honest of contractors"; also that "all leather used in the contract must be critically examined and be absolutely of the kind and quality, tannage and weight, specified," etc. It is impossible to hold that these inspectors were not performing an important official function in connection with the government's acceptance or rejection of the shoes called for by the contract. Compare Foster v. United States, 256 Fed. 207, 211, 167 C. C. A. 423.

In United States v. Birdsall, 233 U. S. 223, at page 230, 34 Sup. Ct. 514 (58 L. Ed. 930), Mr. Justice Hughes said:

"Every action that is within the range of official duty comes within the purview of those sections. * * * To constitute it official action, it was not necessary that it should be prescribed by statute; it was sufficient that it was governed by a lawful requirement of the department under whose authority the officer was acting. Rev. Stat. § 161 [Comp. St. § 235]; Benson v. Henkel, 198 U. S. 1, 12 [25 Sup. Ct. 569, 49 L. Ed. 919]; Haas v. Henkel, 216 U. S. 462, 480 [30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112]. Nor was it necessary that the requirement should be prescribed by a written rule or regulation. It might also be found in an established usage which constituted the common law of the department and fixed the duties of those engaged in its activities. United States v. Macdaniel, 7 Pet. 1, 14 [8 L. Ed. 587]. In numerous instances, duties not completely defined by written rules are clearly established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery."

The fact that these inspectors acted only in a preliminary or in an advisory capacity, and without final power to reject or accept, does not prevent their duties from being official duties. Final decisions frequently, perhaps generally, rest in large part upon the honesty and efficiency of preliminary advice. In the Birdsall Case, the functions of the special officers convicted were purely advisory—the final decision on the application for executive clemency being that of the President, who necessarily relied in large part upon the Secretary of the Interior and the Commissioner of Indian Affairs, who in turn relied upon the advice of the defendants. Honesty at the top is not enough; it must begin at the bottom and run through the whole service. To sustain the contention of the defendants that these inspectors were not performing an official function would be to rule that the thousands of inspectors

employed to advise and assist the government under the contracts for the hundreds of millions of war supplies might be bribed with impunity. To state the proposition is to reject it.

[2] (2) The defendant also complains of alleged prejudicial error through the admission of evidence that middle soles too narrow were used, and that in order to stretch them to make them flush with the outer soles they were slit, thus leaving a hole through the middle sole under the ball of the foot. The indictments contain no allegation of fraud in the use of middle soles. This evidence was admitted as bearing solely on the question of the defendant's intent, which was, as already pointed out, the gist of the case. On this point the court instructed the jury as follows:

"As bearing on whether this intent was honest, as he says it was, or dishonest, as the government says it was, the government was allowed to introduce evidence as to the middle soles—evidence the upshot of which, if you believe it, is that with the defendant's knowledge and approval middle soles were used, which were too narrow and which were widened out, so that they showed fair around the edges of the shoe, by slitting them through the middle and then pulling them out, which, of course, left a hole under the ball of the foot. Now, the inference of an intent in the purchase of materials from what the man did in the manufacturing of the product is perhaps rather a far cry, but the government's argument is this: That if he intended, as they say they believe he did, to use bad middle soles, he probably intended to use bad inner soles. They say: 'We don't care how the defect in the middle soles arose. If you find a man intentionally putting in a bad middle sole, then you may view with suspicion, and perhaps with rejection, his assertions that he did not intend the bad inner soles which he had to be used.' The government says to him: 'We find you using bad middle soles, and are we to believe your protestations that these bad inner soles that you bought were to be culled and picked over very carefully before they were used, and that you did not intend any of the bad inners to be used, when we find you using bad middle soles?'—that is the argument, Mr. Foreman and gentlemen. 'And therefore,' the government says, 'he was intending to put out a bad shoe, and a shoe substantially different from the contract.' That is the only way in which that evidence as to middle soles bears on this trial and accusation."

There was evidence that this practice of using middle soles too narrow and slitting and stretching them so as to make them come out flush with the outer soles was brought to the defendant's attention, and that he said:

"Those are the only soles that we have got and they have got to go."

This evidence was plainly competent for the purpose for which it was admitted by the trial judge. See Coldwell v. United States, 256 Fed. 805, 811, 168 C. C. A. 151. This was an indictment under the Espionage Act of June 15, 1917 (40 Stat. 217), for publishing on January 13, 1918, statements charged as willful attempts to cause insubordination, etc., in the military and naval forces of the United States. As bearing upon the question of the defendant's intent, the court admitted circulars containing advice not to register, and against conscription, distributed by the plaintiff in May, 1917, before the act under which he was tried had been enacted into law. But this court held that they were properly admitted—

"for the purpose of showing the intent with which the defendant made the statements with which he was charged in the indictment under which he was being tried."

In Pass v. United States, 256 Fed. 731, 168 C. C. A. 77, an indictment for failure to register under the Selective Draft Act (Comp. St. §§ 2044a–2044k), where the defense was that the defendant had in good faith registered in a place other than his alleged permanent home, the Court of Appeals for the Ninth Circuit held it was no error to admit a circular published on or about May 11, 1917, attacking conscription, although the defendant's only connection with that circular was that at a meeting the defendant contributed money taken at a collection to pay for the leaflet.

It is not necessary for us to go as far as the court went in that case in order to sustain the admissibility of the evidence of using slit middle soles as indicating an intent to defraud the government in using outer and inner soles inferior to the requirements of the contracts. The acts were similar, contemporaneous, and bore directly on the problem put to the jury for solution—did the defendant intend to cheat the government by palming off shoes known by him to fall far below the contract standard, or did he honestly intend and attempt to comply in all substantial respects with the provisions of the contract? See, also, Heike v. United States, 227 U. S. 131, 33 Sup. Ct. 226, 57 L. Ed. 450, Ann. Cas. 1914C, 128; Williamson v. United States, 207 U. S. 425, 441, 28 Sup. Ct. 163, 52 L. Ed. 278; Wood v. United States, 16 Pet. 342, 360, 10 L. Ed. 987; Jelke v. United States, 255 Fed. 264, 166 C. C. A. 434; Melanson v. United States, 256 Fed. 783, 168 C. C. A. 129; State v. Lapage, 57 N. H. 245, 24 Am. Rep. 69.

In State v. Lapage, 57 N. H. 245, 24 Am. Rep. 69, and People v. Molineaux, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193, nearly all the earlier cases bearing on this class of evidence are cited and reviewed.

The case at bar bears little or no resemblance to the case of Fish v. United States, 215 Fed. 544, L. R. A. 1915A, 809, 132 C. C. A. 56, where evidence of previous fires under suspicious circumstances was held incompetent on the issue whether the defendant had burnt his yacht to defraud the insurance company.

[3] (3) The trial took place in May, 1919. After the filing of the defendant's draft bill of exceptions, one of the defendant's counsel discovered that two government witnesses, Kempton and Winship, were not sworn before giving their testimony. Thereupon a motion was made for a new trial, which, after hearing, was denied by the District Court. On this denial is grounded assignment of error No. 33. The witnesses in question testified to subordinate facts concerning the purchase of the 8½-iron soles and the inferior leather used in the inner soles. The defendant, later, testified in substance to the same facts. The court in denying the motion stated that when the case was committed to the jury the facts testified to by these unsworn witnesses—

"had been removed from the realm of dispute and controversy, and were practically admitted. That being so, the evidence of these two witnesses, Winship and Kempton, which at first had been of very considerable importance, became of very slight importance because the fact to which Kempton and Winship testified had ceased to be in the realm of controversy. So that we are, in fact, dealing with the failure to swear witnesses whose testimony, in my opinion, didn't enter in any degree into the final result of the case."

Moreover, one of the defendant's counsel noticed at the time that the witnesses took the stand that they were not then sworn, and made a note of the fact; he called it to the attention of counsel who was conducting the trial, and at his suggestion inquired of the clerk whether these witnesses had been sworn. The clerk stated that the witnesses had been sworn on a previous day, and defendant's counsel proceeded, content with this assurance. Months after, on examining the certificate of the witnesses, it was discovered that the witnesses were not present on the day when the clerk supposed they had been sworn.

It is manifest that if, when defendant's counsel observed the omission, the matter had either been brought to the attention of the court or of the witnesses who were testifying, the omission would at once have been corrected. It is not necessary to determine whether on these facts the defendant must, because of the knowledge of his counsel, be held to have waived the right to have the witness sworn; for it is clear that the failure to administer the oath was but harmless error, and that the motion for a new trial was addressed to the sound discretion of the court. It would be trifling with justice to set aside this verdict for failure to administer an oath to witnesses, after the defendant had himself voluntarily testified to essentially the same facts. Motes v. United States, 178 U. S. 458, 20 Sup. Ct. 993, 44 L. Ed. 1150.

[4] The denial of such motion is not, except under unusual circumstances, reviewable by the appellate court. Holmgren v. United States, 217 U. S. 509, 521, 30 Sup. Ct. 588, 54 L. Ed. 861, 19 Ann. Cas. 778; Kirchner v. United States, 255 Fed. 301, 306, 166 C. C. A. 471; Mitchell v. United States, 196 Fed. 874, 116 C. C. A. 436; Garanflo v. United States, 246 Fed. 910, 913, 159 C. C. A. 182; Dean v. United States, 246 Fed. 568, 574, 158 C. C. A. 538; Preeman v. United States, 244 Fed. 1, 11, 156 C. C. A. 429; Riley v. Monohan, 26 Iowa, 507, 509; Motes v. United States, 178 U. S. 458, 20 Sup. Ct. 993, 44 L. Ed. 1150; Wigmore's Ev. §§ 21, 1819. Cf. Judicial Code, § 269, as amended by Act Feb. 26, 1919; Yazoo, etc., R. R. v. Mullins, 249 U. S. 531, 533, 39 Sup. Ct. 368, 63 L. Ed. 754; Camp v. Gress, 250 U. S. 308, 318, 39 Sup. Ct. 478, 63 L. Ed. 997.

(4) By his twenty-ninth assignment the defendant urges error because the court permitted the case to go to the jury after the United States attorney in his closing argument had said:

"I firmly believe the government is entitled to a verdict of guilty."

This assignment is without merit, because, without discussing other grounds, the defendant did not ask the trial court to take the case from the jury because of the alleged improper argument, but, on the contrary, desired, and so indicated to the court, to have the case go to the jury under the court's instruction, given and repeated at the defendant's request, that the personal opinion of the prosecuting officer was not for the jury to consider. Moreover, defendant's counsel expressly stated to the court that the matter should be left to be dealt with on his motion for a new trial, and thereafter made two separate motions for new trial without even suggesting to the District Court that the remark

objected to was ground for setting aside the verdict. On such a record it is unnecessary to discuss whether, under any circumstances, such argument by the United States attorney could be held reversible error. See Diggs v. United States, 220 Fed. 545, 555, 136 C. C. A. 147, and cases cited.

(5) By assignments Nos. 2, 3, 11, 12, 13, and 16 the defendant urges error in admitting evidence from the witness Sherwood to the effect that inner soles, soft and coarse-fibered, would spread from the shoe sole, and that the coarse fiber would tear, and other evidence to the effect that such inferior grade inner soles would curl up and leave a hard ridge; also to the admission of evidence from one Strink to the effect that he called Inspector's Smith's attention to the passing of inner soles with holes in them. But all this evidence was plainly competent on the question of the extent to which the inferior leather shown to have been purchased for use under this government contract actually went into the army shoes and its effect upon the quality of the shoes. As already pointed out, the defendant's chief contention was, not that there was not variation from the contract, but that this variation was trifling, negligible, not warranting the inference of an intent to defraud the government.

For the same purpose, the evidence of Inspector Farley was plainly competent. He testified, in effect, that about 60 per cent. of the inner soles in the shoes inspected by him would barely meet the specifications, and that about 40 per cent. were below the specifications. In the presence of the jury he examined various shoes taken from those furnished by the Bates Company under the contract, and described the results of using in them poor inner soles, stating as to one that it was an inner sole that would curl and roll up under a man's foot. The following then occurred:

"Q. 5. Do you know what the effect on the man's foot would be, a man who walked on a sole like that, marching for several hours? A. It would blister his feet.

"Mr. Walsh: Just a moment.

"Q. 6. If you know from your experience with sole leather.

"The Court: Do you know what would happen?

"The Witness: Yes, sir.

"The Court: Then what would happen?

"Mr. Walsh: My exception to that, your honor.

"The Court: Yes.

"The Witness: Blister the man's feet. [Examining another pair of shoes:] There is a sole that, if a man walked three miles, I would bet my life he would have blisters on his feet."

The question excepted to was manifestly proper. No motion was made to strike out the last part of this answer as irresponsive or otherwise improper.

(6) The defendant's twenty-eighth assignment of error is directed against the court's refusal to order a verdict of not guilty upon the indictment charging the defendant with conspiracy to defraud the government. On this, as indeed throughout much of the defendant's counsel's lengthy and able brief, the court is really asked to assume the functions of the jury. Plainly, the purchase of 8½-iron outer soles instead of 9-iron, at a price substantially less than the market

price for the 9-iron soles; the purchase of inner soles of a lower grade than that called for by the contract, also at a price much below the market for the quality called for by the contract; supplemented by other evidence of the use of large quantities of these inferior outer and inner soles—warranted the jury in finding, as they did find, that the defendant conspired with Sherwood to defraud the government. It was for the jury to say whether the defendant's explanation that out of purchases of about 200,000 8½-iron soles he honestly expected to cull 114,000 9-iron outer soles was an honest or a dishonest explanation. So, also, as to the purchase and use of the inferior inner soles: It was for the jury to say whether this was a minor, and perhaps negligible, variation from the contract, or was a part of a scheme to defraud the government by putting into army shoes leather much inferior in quality to that called for by the specifications.

[5] (7) By the twenty-sixth assignment the defendant alleges error in the court's refusal to permit the witness Slayton to testify as to the percentage of 9-iron soles found in a lot of 80,000 8½-iron soles bought by the witness in September, 1918, from the same concern from which the Bates Company had bought 8½-iron soles in large part intended for and used in the government contract in the period from October, 1917, to March, 1918. But this exclusion was plainly within the court's discretion. It appears that there was a substantial difference in the sole leather market in October, 1917, and in September, 1918, growing, in part, out of the fact that in the later period the government was permitting the use of 8½-iron soles in army shoes, thus diminishing the demand for 9-iron soles. It further appeared, and the court stated, that there was no evidence that this concern was grading its soles in September, 1918, as it was in October, 1917.

Compare Griffin v. United States, 248 Fed. 6, 160 C. C. A. 146; Alexander v. United States, 138 U. S. 353, 356, 11 Sup. Ct. 350, 34 L. Ed. 954; Commonwealth v. Holmes, 157 Mass. 233, 240, 32 N. E. 6, 34 Am. St. Rep. 270.

[6] (8) By the thirtieth assignment the defendant alleges error in the court's refusal to instruct the jury, as requested by the defendant, with reference to the two indictments for conspiracy to bribe the inspectors, and urges that the eighth, ninth, eleventh, fourteenth, and fifteenth requests were not given either in form or substance. These requests are as follows:

"8. If the jury find that either inspector received the gifts of money innocently and without intending to be improperly influenced in the performance of his duties, that is some evidence that the money was given to him innocently and for a proper purpose.

"9. The government, having called Sherwood as its witness, cannot impeach his testimony and argue that he is unworthy of belief. Sherwood testified that he did not give the money to either inspector with any intent to influence him in his official action. The government is bound by this testimony, and there is no testimony or evidence to contradict it."

"11. If the jury believe that Sherwood acted as a mere instrument of Sears in giving the money to either of the inspectors, and did not intend that either of them should be influenced in his official action by such gift, you cannot find that the conspiracy alleged in the indictment was executed by the giving of the money, and Mr. Sears must be acquitted."

"14. If the jury find that the defendant intended to offer the money to Smith or Honen merely as an equivalent of the allowance which the government would give them in case they were transferred to another factory, he cannot be convicted.

"15. If Smith and Honen had a right to apply to the War Department for a transfer to some other shoe factory, and if the purpose of the defendant in giving them money was merely to induce them not to apply for such transfer, but to remain at the Bates factory, the defendant cannot be convicted."

Record, pp. 107, 108.

After carefully cautioning the jury to remember, in considering Sherwood's testimony, that he was a self-confessed criminal and an accomplice of the defendant, the court continued:

"May I remind you, gentlemen, that we are regarding, not the statement of this witness or that, but the fact itself. We are looking through the witness to the occurrence, and trying to see what that occurrence was. Sherwood says it was a very corrupt piece of business on the part of Sears. Sears denies that. What is the fact about it?

"Upon the defendant's testimony this charge of bribery would rest on what view you took of his intention in the matter of making the payments. Bribery is a crime that, as I told you, rests on corruption. A man must have a corrupt purpose, or he should not be convicted of bribery or of conspiracy. There is no such thing as an innocent bribery. Taking the defendant's testimony, was his purpose in authorizing or approving the payments to Smith and Honen an innocent purpose, or was it a corrupt purpose?

"In deciding that question, of course, you are not limited to what he says his purpose was, or to what Sherwood says his purpose was. You are, as I said, to look through the man's expressions and protestations to the fact itself. Why did he authorize the payment? With what motive did he sanction it—with what end in view? A man is presumed to intend the natural results of his act. That presumption is not conclusive; but if a man pays money to a government inspector, and the natural result of that payment would be to influence the inspector's action, there is a presumption that the man realized it at the time when he made the payment, and intended that result. You may, however, disregard that presumption. You may say, 'The facts convince me that it was not so in this case, and that in this instance I either am in doubt about the corruption, or I am satisfied there was no corruption;' and you should give the defendant the benefit of the doubt and of your finding, if they are his way. * * * In reference to the alleged conspiracies to bribe the inspectors, the defendant should not be convicted there unless both he and Sherwood planned to bribe those men. As I described to you, both the defendant and Sherwood must have had a corrupt plan in making the payments of money to them. And I will add this as to Sherwood: In so far as you consider Sherwood's evidence, you should not follow it, unless it is corroborated in all material particulars. Sherwood's evidence, you know, was only a part of the evidence in that case."

These instructions were adequate and fully protected the defendant's rights. There was no error in refusing to give verbatim the specific instructions requested. The charge was eminently fair to the defendant and correctly submitted the case to the jury.

We have dealt with this assignment on its merits and without reference to defendant's failure to comply with rule 11 of this court (150 Fed. xxvii, 79 C. C. A. xxvii), which requires alleged error to the charge of the court in instructions given or instructions refused to be set out in the assignments totidem verbis.

Various other alleged errors are urged as to the admission or exclusion of evidence of very insignificant importance; but we regard it as sufficient to say that on careful examination of them we regard them

all as without merit. We are satisfied, and hold, that the defendant had a fair and legal trial. The judgment below must be affirmed.

The judgment of the District Court is affirmed.