## MACDONALD v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. April 20, 1920.)

No. 1436.

1. Criminal law ⬤◆370—Bribery of government inspector under prior contract not admissible on trial for conspiracy to defraud.

On a trial for conspiracy to defraud the United States by the use of counterfeits of the stamping devices used by government inspectors in a factory manufacturing shoes for the government, where defendant denied all knowledge that the counterfeit stamps had been procured or used, evidence that he placed a government inspector at the factory under a pre-

⬤◆For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

vious contract on the factory pay roll under an assumed name was not admissible, as it did not tend to show his knowledge that the counterfeit stamps were procured and used, and the question was not whether he had guilty knowledge, but whether he had any knowledge at all.

·2. **Criminal law** ☞369(1)—**Other offenses not admissible to show tendency to crime.**

On a trial for conspiracy to defraud the United States, evidence of a corrupt understanding with a government inspector in connection with a previous contract with the government was not admissible to show that defendant had an evil disposition, and that his character was such that he would be likely to enter into a conspiracy such as that charged.

·3. **Criminal law** ☞370—**Other offenses not admissible to show guilty knowledge, unless in issue.**

Evidence of other offense is not admissible as tending to show defendant's guilty knowledge, unless guilty knowledge or intent is in issue.

4. **Criminal law** ☞783(1)—**Instruction as to consideration of evidence of other offenses erroneous.**

On a trial for conspiracy to defraud the United States by using counterfeits of the stamping devices used by government inspectors in connection with the manufacture of shoes for the government, where defendant, the general manager, denied knowledge of their use, as neither guilty knowledge nor intent were in issue, an instruction that the jury might consider a corrupt transaction with a government inspector under a previous contract as throwing light upon whether defendant was innocent or guilty in his knowledge of the transaction involved in the trial, was in effect an instruction that they might consider it in determining whether he was innocent or guilty of being concerned in the conspiracy charged.

·5. **Criminal law** ☞899—**Exception to evidence not waived by introducing explanatory evidence.**

On a trial for conspiracy to defraud the United States in connection with the manufacture of shoes for the government, defendant's exception to evidence concerning his bribery of a government inspector under a previous contract was not waived by introducing evidence explaining the transaction with such inspector.

·6. **Criminal law** ☞1172(2)—**Error in instruction as to consideration of evidence not cured by explanatory evidence.**

Where defendant, charged with conspiracy to defraud the United States in connection with the manufacture of shoes for the government, excepted, not only to evidence of the bribery of a government inspector under a previous contract, but also to the court's instruction as to the use which the jury might make of such evidence, the instruction, if erroneous, could not be cured. because defendant introduced testimony in explanation of the evidence as to the transaction with the inspector.

Anderson, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District ·of Massachusetts; James M. Morton, Judge.

Laurie S. Macdonald was convicted of conspiracy to defraud the United States, and he brings error. Reversed and remanded.

Guy A. Ham, of Boston, Mass. (Ralph H. Willard and William H. Taylor, both of Boston, Mass., on the brief), for plaintiff in error.

Lewis Goldberg, of Boston, Mass. (Thomas J. Boynton ·and Daniel A. Shea, both of Boston, Mass., on the brief), for the United States.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges. ·

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

JOHNSON, Circuit Judge. The plaintiff in error was jointly indicted with John J. Harrington and Oscar N. Johnson for conspiring to defraud the United States by the use of counterfeit stamping devices in the factory of Thompson Bros., a corporation engaged in the manufacture of shoes at Brockton in the district of Massachusetts. Macdonald was the general manager and director of the company, Harrington was the foreman of its sole leather room, and Johnson his assistant. The company had entered into a contract to manufacture army shoes for the United States, and government inspectors had been sent to its factory to examine the leather and other materials to be used in their manufacture. These inspectors were provided with stamping devices with which they stamped the leather that they deemed suitable for use.

The defendants were charged in the indictment with having conspired to defraud the United States by causing duplicates of the stamping devices in use by these inspectors to be made and used in stamping pieces of leather which had not been examined and inspected, or which had been rejected by the inspectors, so that these should be used in the manufacture of shoes under the contract, and that, in furtherance of this unlawful conspiracy, they had procured duplicate stamps of three government inspectors and caused them to be used to stamp leather which went into the manufacture of shoes under this contract, and which had been rejected or never had been inspected by the government inspectors.

Harrington pleaded guilty and was a government witness. The jury by its verdict acquitted Johnson, but found Macdonald guilty, and he has brought this writ of error, assigning as error the ruling of the court in the admission and exclusion of testimony and the giving and refusal to give instructions.

It was not in dispute that counterfeit stamps were used in the factory of Thompson Bros. upon outer soles and inner soles used in the manufacture of shoes under the government contract. The use of such stamps was discovered by government inspectors by reason of the impressions made by them being somewhat larger than those made by the true ones.

Harrington testified that Macdonald, finding that there was a large accumulation of inner soles and outer soles that had been rejected by the inspectors, directed him to have Johnson procure duplicates of their stamps; that Johnson did so, and had the bills made to himself as purchaser, but that they were paid by the company; and that these duplicate stamps were used to stamp inner soles and outer soles which, when so stamped, were used in the manufacture of shoes under the government contract.

Early in April, 1918, one of the government inspectors discovered that a duplicate stamp had been used, and he informed Macdonald. Officers of the Quartermaster's Depot at Boston sent for Macdonald, and he was there told about the discovery of the use of the counterfeit stamps, and stated that he knew nothing about it. He was told, however, by the officers that he must produce the parties who were

guilty of the use of these stamps within 48 hours or the government contract with Thompson Bros. would be canceled.

Harrington testified that Macdonald told him about the discovery of the use of the counterfeit stamps and what had occurred in Boston, and stated that, if the government wanted to, they could ruin Thompson Bros. by canceling the contract with them, which would leave the company with $600,000 or $700,000 worth of material on its hands, and that Macdonald asked him if he would go into the Quartermaster's Depot and tell the officers there that he was the guilty person, and that he was the only one who had anything to do with the entire matter; that the witness at first refused, and said to Macdonald, "Let's all go in and tell what was done;" and Macdonald said, "No, we can't do that; we can't go to work and put the Thompson Bros. firm in that position;" and Macdonald said to him, "You do it; I can fix it up; Edwards has had this matter transferred from Washington to Boston, and I can fix it up there;" that after some further urging by Macdonald he agreed to do as Macdonald wished, upon the latter's assurance that he would take care of him, and see that no harm came to him; that, in accordance with this agreement, he went in to the Quartermaster's Depot and told the officers in charge there that he was the guilty person.

There was testimony that these officers required that Harrington should leave the employ of Thompson Bros., and that he should not work in any factory which had a contract with the government. After leaving the factory of Thompson Bros., Harrington received from the company $655, of which $55 was paid as salary for the week prior to his leaving, and $600 was paid by Mr. Atwood, an employé of Thompson Bros., by direction of Macdonald, to Mrs. Harrington in three payments of $200 each.

On April 23, 1918, Harrington was arrested upon an indictment obtained against him, and testimony was offered by the government showing various conversations between Macdonald and Harrington, in which Macdonald urged him "to stick" to his story that he had told the officers of the government, and that Thompson Bros. would protect him.

Mrs. Harrington testified to conversations between Macdonald and her husband which tended to show that Macdonald was implicated in the fraud that had been practiced, and was very much concerned lest Harrington should divulge his connection with it, and that in one conversation Macdonald said, "I suppose they will get me into this before they get through; but my back is to the wall."

Johnson was called by the government as a witness and testified that some time in December, 1917, he left an order for a stamp with the Donnelly Machine Company, having on it the name "Hallinan," which was the name of one of the government inspectors at the factory; and he further testified that, at Harrington's request, he had two stamps, bearing the numbers "88" and "103," made at the Donnelly Machine Company; that he did not know the Hallinan stamp was used at all on government shoes, and that he never had any talk with Macdonald about any fraudulent stamp; that Harrington told him

that the Hallinan stamp was to be used on "rookie" shoes for the civilian trade, as it was the custom in shoe factories to mark such shoes with a stamp to indicate to the public that they had been inspected by some one; and that he never saw the Hallinan stamp used on army shoes.

The defendant Macdonald testified in his own behalf that his only financial interest in Thompson Bros. was one share of stock, which he held to qualify him to act as a director of the company; that he had no knowledge that any duplicate stamps were procured or used, and that his attention was first called to the fact that such were being used in the factory on April 6, 1918, when a Mr. Collette, his assistant, spoke to him about it, and in consequence of this information he sent for another inspector; that after talking with the latter he went at once to Boston to see Capt. Edwards of the Quartermaster's Depot. While Capt. Edwards did not tell him what the trouble was, he got the impression that something was wrong; that he told Capt. Edwards, if anything was wrong, to telephone him at once, and he would go to Boston at any time. He then returned to Brockton and personally conducted a search through the factory for outer soles with duplicate stamps upon them, which could be recognized because slightly larger than the inspector's stamps, and that the shoes that were found with the impression of the duplicate stamp upon them were taken care of, so that there would be no possibility of their getting out of the factory. Upon getting to his home that night he telephoned to Harrington, who came to see him, and he asked Harrington if he had any duplicate stamps in the factory, and Harrington replied that he did not. A few days later he received word from Capt. Edwards of the Quartermaster's Depot, in consequence of which he went to the Quartermaster's Depot, where he was informed that an affidavit signed by the factory inspectors had been filed, and also a shoe taken from the factory bearing the counterfeit stamp. After he had been told that he would be held responsible for what had happened and given 48 hours to find out and produce the person who used the duplicate stamp, he returned to Brockton and sent for Harrington to come to his home. He testified he sent for him, because he was the head of the sole leather department in the factory; that when he arrived he admitted that he had bought duplicate stamps from the Donnelly Machine Company, and gave as his reason for doing so that he had viscolized some soles to expedite the work, and, finding that the inspectors would not pass the soles after they had been viscolized, "he had gotten the stamps in order to stamp them up and get them by." Macdonald also testified that the three payments of $200 each were made as a loan to Mrs. Harrington by Mr. Atwood at his request; that payments to Harrington were discontinued, because of discoveries made at the factory showing that inferior leather had been purchased by Harrington. Macdonald denied that he had ever made any arrangement with Harrington by which the latter was to confess that he was the party alone responsible for the use of the counterfeit stamps, or that he had ever had conversations with Harrington which were detailed by the latter and which Mrs. Harrington said she heard.

Upon cross-examination, and against the objection of his counsel, the government was allowed to interrogate him in regard to his relations with one Collette, a government inspector at Thompson Bros.' factory, under a previous contract; and he testified that Collette was placed on the pay roll of Thompson Bros. under the name of "H. Johnson" by his direction, and received $10 a week while he was a government inspector. This testimony was admitted by the court for the purpose of showing "guilty knowledge of the fact that the government was being defrauded by the use of a counterfeit stamp," and in his charge to the jury the court gave the following instruction in regard to it:

"The Collette evidence has this bearing: It is not at all on trial here whether Macdonald had a corrupt understanding with Collette or not in reference to Collette's inspection of the shoes under a preceding contract, but the question in this case before you is whether Macdonald was an innocent or a knowing party to a plot that was being made to defraud the United States, if you find that, shortly before the incidents here under consideration, Macdonald was a knowing party to a corrupt understanding or corrupt transaction in reference to. the inspection of shoes being made in the same factory for the United States under a different contract, but generally speaking the same kind of work, you may consider that fact as throwing light upon whether he was innocent or guilty in his knowledge of this transaction."

The admission of this testimony and this instruction are assigned as error.

Subsequent to the admission of this testimony Collette was called by the defendant and testified that he had tendered his resignation as a government inspector, and that his work in connection with the inspection of leather for the government, which entered into shoes manufactured under the contract with Thompson Bros., had been fully discharged, although he was still a government inspector when Macdonald made the arrangement with him by which he should receive some compensation from Thompson Bros. for his assistance in establishing at the factory the manufacture of ladies' shoes, which had not been previously manufactured there.

[1, 2] The use of counterfeit stamps upon leather which had been rejected by the government inspectors was proven by the testimony of Harrington. Macdonald had denied any knowledge that any counterfeit stamps had been procured or used in the factory. It was necessary, therefore, in order to connect him with the conspiracy,·to show that his testimony was false and that he did have such knowledge.

We are unable to see how evidence that Macdonald had a corrupt understanding with Collette would tend to show that Macdonald had any knowledge, whether guilty or innocent, that counterfeit stamps were procured and used under a contract with which Collette had no connection. It might tend to show that Macdonald had an evil disposition and that his character was such that he would be likely to enter into a conspiracy such as that charged in the indictment; but it could not be admitted for this purpose under the well-known rule of evidence, which was considered and applied in this circuit in Fish v. United States, 215 Fed. 544, 132 C. C. A. 56, L. R. A. 1915A, 809, that upon the trial for one offense evidence of another distinct and unrelated offense committed by the defendant is not admissible, unless

it is offered for one of the purposes which constitute exceptions to this general rule.

[3] The court below stated as the ground for his ruling and instruction that the testimony tended to show guilty knowledge; but it seems to us that he failed to recognize that, before testimony can be admitted under this exception, guilty knowledge or intent must be in issue. Guilty knowledge was not in issue under the facts established by the testimony in this case. The issue to be determined by the jury was not whether the defendant's knowledge was guilty or innocent, but whether he had any knowledge of the procurement of the counterfeit stamps and their use; and if they should find that he did have, then it necessarily followed that such knowledge must be guilty knowledge, as there was no claim that the counterfeit stamps were procured or used by inadvertence, accident, or mistake, or for the purpose of deceiving the public, which, from the evidence, would seem to have been considered innocent by shoe manufacturers.

[4] As neither guilty knowledge nor intent were in issue, the instruction of the court that the jury might consider the transaction with Collette "as throwing light upon whether he was innocent or guilty in his knowledge of this transaction" was, in effect, an instruction that they might consider it in determining whether Macdonald was innocent or guilty of being concerned in the conspiracy with which he was charged, and it seems to us that the jury must have so understood it.

In Costelo v. Crowell, 139 Mass. 588, 2 N. E. 698, the court in its opinion makes the following cogent statement of the reasons why such evidence should not be received for the purpose of proving a defendant guilty of the crime of which he is charged, and we think it applies with peculiar aptness to the evidence which was admitted in this case:

"In cases where a person is accused of a crime, it is not competent to show, as evidence of the corpus delicti, that he has committed similar offenses, or that he is of bad character, or that he has the capacity and the means of committing the crime. The argument in favor of admitting such evidence is plausible. It might aid the jury if they could know the character of the defendant—whether he is a man morally and physically able and likely to commit the offense; but the law excludes such evidence upon grounds of public policy, to prevent the multiplication of issues in a case, and to protect a party from the injustice of being called upon, without notice, to explain the acts of his life not shown to be connected with the offense with which he is charged.

"If the fact that a defendant has committed a similar crime is not admissible, it is difficult to see how less pregnant evidence that he has the disposition or the capacity and means to commit it can be competent."

[5, 6] We have carefully examined the cases cited upon the government's brief as authority for the claim that, because the defendant himself testified and also introduced evidence in regard to the same facts which were disclosed by incompetent testimony, such testimony became competent; but none of them go to the extent of holding that, if a defendant introduces evidence to explain such incompetent testimony, not caring to stake the result in the appellate court upon the exception which he has saved, he has thereby waived his exception.

In Motes v. United States, 178 U. S. 458, 20 Sup. Ct. 993, 44 L. Ed. 1150, which is cited as the strongest authority for this position, evidence had been erroneously admitted which tended to establish the guilt of Motes and three other defendants of the crime of murder, for which they were being tried. Motes subsequently testified in his own behalf that he committed the murder, and the court held that—

"It would be trifling with the administration of the criminal law to award him a new trial because of a particular error committed by the trial court, when in effect he has stated under oath that he was guilty of the charge preferred against him."

Macdonald did not, in the testimony given by him or in that which he introduced, admit that he was guilty of the charge preferred against him, but sought only to explain away the appearance of a corrupt understanding with Collette. In doing this he did not admit that he was a party to the conspiracy with which he was charged, nor did he waive his exception to the admission of the testimony in regard to his connection with Collette. The exception urged was, taken to the instruction of the court to the jury as to the use which they might make of the evidence, as well as to its admission, and, if this instruction were wrong, it could not be healed, because the defendant had introduced testimony in explanation of the testimony which had been drawn out from him on cross-examination.

As we think there was error in the admission of this testimony and in the instruction complained of, and that the defendant was prejudiced thereby, it will for this reason alone be necessary to reverse the judgment of the court below and grant a new trial, and we do not think it necessary for us to consider the other errors which are assigned.

The judgment of the District Court is reversed, the verdict set aside, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

ANDERSON, Circuit Judge. (dissenting). From the opinion and decision of the majority I am compelled to dissent. I cannot believe that the law permits the reversal of this judgment on the ground that the evidence admitted of the relations between Macdonald, defendant and witness in his own behalf, and Collette, his chief corroborating witness, was not competent—not only for the use to which it was limited by the trial court, but for much broader purposes.

The order in which the facts have been marshaled in the majority opinion seems to me to furnish but a blurred—and to that extent incorrect—picture of what actually occurred at the trial. Consequently I am required, at the expense of considerable repetition, to restate the case almost in its entirety, in order to present what I think are the real issues, and the views I am constrained to hold with reference to those issues.

The defendant Macdonald, Oscar N. Johnson, and John J. Harrington were indicted for conspiracy under section 37 of the Criminal Code (Comp. St. § 10201). Macdonald was superintendent and general manager of Thompson Bros. Company, a shoe-manufacturing

concern in Brockton; Harrington was foreman of the sole leather department; and Johnson was his assistant.

Under date of October 19, 1917, the company entered into a contract to manufacture army shoes for the United States. It was at the same time manufacturing other kinds of shoes for civilian customers. The leather used in the manufacture of the army shoes was subject to inspection on the premises by government inspectors before and during the process of manufacture.

The indictment charged that the three defendants conspired to defraud the United States by causing counterfeit stamps to be made and used in stamping inferior leather not actually examined and passed by the government inspectors, thus procuring the use of such inferior leather in the army shoes.

Conspiracy to defraud by breaking down the government's inspection system was the gist of the case.

Harrington pleaded guilty. Macdonald and Johnson were put to trial. The jury found Johnson not guilty, and Macdonald guilty. Macdonald was sentenced to imprisonment in the House of Correction at Plymouth for 15 months, and brought this writ of error.

After the government's case was in, there was no serious claim made that counterfeit stamps were not procured and used in this factory on outer soles and inner soles put into the manufacture of shoes under the government contract. But the real question—as distinguished from the legal and technical issue—was whether Macdonald was the principal in the crime and had ordered the procurement and use of the fraudulent stamps in order to secure the use of inferior leather in the army shoes, or whether he was, as he claimed, a victim of wrongdoing initiated and carried out mainly by Harrington, to right which he (Macdonald) claimed to have made every honest and seasonable effort. The main question, therefore, that the jury had to decide, was a question of credibility. There was a sharp and irreconcilable conflict between the testimony of Harrington and his wife, the chief government witnesses, and that of Macdonald and Collette, whose testimony was the main reliance of the defense.

Harrington, called by the government, testified that in the latter part of December, 1917, he informed Macdonald that there was an accumulation of rejected inner soles not fit for government work, which could not be returned to the vendors, because they had been skived; that Macdonald instructed him to bring to him the inspectors' stamp, on examining which Macdonald said: " 'I guess we can duplicate that stamp.' That witness replied: 'I don't believe we can; it would be fraud if we are caught doing it.' " Thereupon Macdonald told Harrington to have an impression made of the stamp, to give it to Johnson, and tell Johnson to have a stamp made. This was done, and Johnson brought a bill for the stamp running to himself, and Macdonald told him to go to Small, the credit man, and get the money. Harrington further testified that after the inspectors had gone home the rejected inner soles were stamped by the counterfeit stamp and used in army shoes; that in March, 1918, Harrington informed Macdonald that there was quite an accumulation of outer

and inner soles which had been rejected by Starr and Battles, two inspectors who used stamps numbered 103 and 88, and at Macdonald's suggestion Harrington sent Johnson for counterfeit stamps so numbered, which stamps were obtained and used for a like purpose and with like effect.

Harrington further testified: That early in April government inspectors discovered the use of the counterfeit stamps, and that he so informed Macdonald; also that on the next Sunday he went to the factory and took all the fraudulently stamped soles and shoes out of the racks. That later he went with Macdonald to the Quartermaster's Department in Boston. That Macdonald said to him:

"Here we are with six or seven hundred thousand dollars worth of material bought for those shoes, and if they want to they can cancel the balance of the order, and also get damages for what they have done; but I think that perhaps we can fix it up."

That Macdonald asked him if he would not bear the burden of it, and go into Quartermaster's Department and tell him he was the guilty person. On Harrington's objecting, Macdonald urged him, saying:

"You do it; I can fix it up. Edwards has had this matter transferred from Washington to Boston, and I can fix it up there."

After further urging by Macdonald, and assurance that he would take care of him and that everything would be all right, Harrington agreed to go to the Quartermaster's Depot with Macdonald and take the entire blame, and did so, Macdonald being present.

On April 23, 1918, Harrington was arrested, and thereafter, as he testified, had various conversations with Macdonald at Harrington's house, in which Macdonald urged him to stick to his story, saying: "We will protect you." Also: "You hire a lawyer and I will take care of you." That later Macdonald asked Harrington "how the district attorney took his story," to which Harrington replied: "I don't think they believe me." That Macdonald asked, "'Why?' and Harrington said, 'They can't see my motive in doing what I have done;' that Macdonald said, 'Damn the motive, we'll furnish one as far as that is concerned;' that at the time of this conversation Macdonald and witness were on the lawn about 15 or 20 feet from Harrington's house, sitting on the grass." There was other evidence relative to the use of inferior leather fraudulently stamped for the government contract; also that after Harrington left the factory on April 17 he received $655 paid to him or to Mrs. Harrington by Atwood, an employé of the Thompson Bros. Company.

Edith Harrington, wife of John J. Harrington, testified at length to conversations with Macdonald concerning the trouble; also that she overheard the conversation between Harrington and Macdonald on the lawn, in which Harrington told Macdonald that the district attorney did not believe his story; also that she heard Macdonald say to Harrington that he was going to pay him $200 every three or four weeks; that Macdonald came into the house and told Mrs. Harrington that Harrington was at work for the Thompson Bros. Com-

pany, just the same as before, but that he (Macdonald) did not want Mrs. Harrington to say anything about it; that he (Macdonald) was going to give her $200 every three or four weeks, but did not want to have it on the books as payment, although Harrington was then under contract, receiving $55 a week, or in excess of $200 a month; that when she heard Harrington and Macdonald outside the house talking, she heard Harrington say, "How do I know whether Johnson is sticking to his story? Why don't you send Johnson up to see me?" and on one occasion she said to Macdonald, "If your telephone has been touched, you have convicted yourself;" to which Macdonald replied, "Why, what did I say?" that Mrs. Harrington answered, "Why, you're telling John all the time that Johnson was going to stick to his story. Why has anybody got to stick to the story? If John has taken the whole of it on his shoulders, is there anybody wants to take the honor from him?" that Macdonald said, "I suppose they will get me into this before they get through, but my back is to the wall."

There was further evidence of the use of the counterfeit stamps on inferior leather. Johnson was called by the government, and testified to procuring the counterfeit stamps; also that Harrington told him that he wanted the first one, called the Hallinan stamp, for "rookie" shoes, used in civilian trade, it then being the custom among shoe manufacturers to stamp shoes in order to indicate to the public that they had been inspected by some one.

As the jury acquitted Johnson, they must have found that he had "innocent" as contrasted with "guilty" knowledge of the procurement and use of the counterfeit stamps. Phelan, a government inspector, testified that in December, 1917, and January, 1918, he saw inner soles coming through, stamped with the Hallinan stamp, that he regarded as inferior. There was some other evidence, not now important, concerning the purchase of stock of an inferior quality for alleged use under the government contract.

This was the government's case.

The defense opened by calling 12 witnesses to testify to the high standing and character of the defendant Macdonald.

Macdonald then took the stand in his own behalf, and gave at great length evidence tending to show the purchase of proper materials for use in the government contracts. With relation to the counterfeit stamps he testified that—

"His attention was first called to the fact that duplicate stamps were being used in the factory on April 6, 1918, when Mr. Collette, his assistant in the factory, spoke to him, and in consequence of what Mr. Collette had to say the witness sent for Mr. Phelan, but found that he was in Boston; he then sent for Mr. Starr, and, after talking with Mr. Starr, Macdonald at once went to Boston to see Capt. Edwards of the Quartermaster's Depot. While Capt. Edwards did not tell him what the trouble was, he got the impression that something was wrong. He told Capt. Edwards, if anything was wrong, to telephone him at once, and he would go to Boston at any time."

He continued that, after his return to Brockton, he saw Collette and took him with him to the making room to look over shoes and

see if they could find any soles with duplicate stamps on them; that he and Collette were able to recognize the duplicate stamp because it was slightly larger than the government stamp; that at the end of the ,day, when leaving, he told Collette to take all the factory die soles out of the making room on the following day, whether they had the genuine or the false stamp, in order that there might be no possibility of this kind of sole getting back into the work. He also, as he testified, instructed the foreman of the packing room to pack up the shoes having the duplicate stamp, so that there should be no possibility of their getting out of the factory; that, on going home, he telephoned to Harrington, and that the latter came to his house; that he told Harrington to go down, Sunday to assist Collette in taking all the factory die soles out of the making room; that he asked Harrington if he had any duplicate stamps in the factory, and that Harrington replied that he did not. Macdonald also testified at length as to his dealings with the army officers at the Quartermaster's Depot; that he was told that the government would have to hold him (Macdonald) responsible for what had happened, and would give him 48 hours to find the party responsible and produce the name of the person who had used the duplicate stamp; that on his return he sent for Harrington, and asked if he had any duplicate stamps, and Harrington then admitted that he had, and had stamped the shoes because he (Harrington) had "viscolized some soles to expedite the work, and, finding the inspectors would not pass the soles after they had been· viscolized, he had gotten the stamps to stamp them up and get them by"; that in later interviews with the army officers Harrington acknowledged that he had procured the duplicate stamps and used them on leather used on government shoes; that the army officers had said to him (Macdonald) that he could· fix up with Harrington in any way he saw fit, but that Harrington could not work in his factory while work on any government order was going on there.

.Macdonald also said that his concern was making the "rookie" civilian shoe, which was something like an army shoe, and "that all manufacturers were using stamps indicating that the soles going into these shoes had been inspected." Macdonald also testified to the payment of salary to Harrington in sums substantially equivalent to those stated by Harrington and his wife; also that he was at one time at Harrington's home and sat upon the lawn about 25 feet from the house. Macdonald denied that he had any conversation with Harrington about rejected inner soles in December, and denied that he knew anything about the Hallinan or first stamp until Harrington told him, some time between April 6 and April 17, and denied that he had any conversation with Harrington at the time Harrington stated the men were using the stamp. He testified, further, that stamps were frequently used to stamp inner soles, and that a great many stamps were purchased in the year, as different dealers wanted the names of certain models or·trade-marks stamped on their shoes, and that such stamping, of course, was done in this factory. He contradicted flatly the evidence of Harrington and his wife as to Harrington's taking the blame and sticking to his story.

The gist of Macdonald's evidence was that he was entirely ignorant as to the use of any fraudulent stamp until it was disclosed to him by Collette in early April, 1918, and that Harrington's first story, told the army officers, to the effect that he was entirely to blame, was the true and correct story. But Macdonald also testified to the common use of inspectors' stamps on civilian shoes, obviously in order to meet the inference that the jury might otherwise draw as to his having knowledge of the payment made for the counterfeit stamps and their presence in the factory. He thus sought to have the jury draw a distinction between his having by inference knowledge of the existence of counterfeit stamps and "guilty knowledge" of their procurement and use in order to defraud the government.

At the outset of the cross-examination, Macdonald testified that Collette, his assistant, through whom he got his first information as to the fraudulent stamp, was a government inspector in Thompson Bros.' plant prior to their securing the contract of October 19, 1917, and until the beginning of that contract. The United States attorney then inquired, "When did he go on your pay roll?" To this counsel objected that it was of no consequence.

"The Court: I quite agree that all the evidence so far does not amount to anything on that phase of it.

"X-Q. 3. That isn't quite an answer to my question. Eliminate the contract feature of it. When did he first go on your pay roll? A. Mr. Collette's name didn't go on our payroll till February 4, 1918.

"X-Q. 4. Well, eliminating the name feature of it, when did Mr. Collette actually go on your pay roll?

"Mr. Ham: I object, and I want to argue that question, your honor.

"The Court: Yes."

Counsel for the government then stated in effect that it was proposed to show that Collette, a government inspector, was with Macdonald's approval on the pay roll under a fictitious name, while in the government's employ and still at work inspecting. Defendant's counsel contended that there was nothing wrongful in the relations between Collette and Macdonald, and objected to the evidence as immaterial.

"The Court: On the question of knowledge—the pinch of this case is the defendant's knowledge; had he a guilty knowledge?

"Mr. Ham: Yes.

"The Court: That is where the case turns, as I look at it. I think we all agree on that, don't we, as a matter of fact?

"Mr. Ham: Yes.

"Mr. Shea: Yes; your honor.

"The Court: I shall let it in, and I will save your exception.

"Mr. Ham: I want my exception saved on the ground that the employment of Collette while a government inspector, previous to Thompson Brothers commencing work on this contract, would have no probative value with relation to this particular conspiracy at this particular time set forth in the indictment, and that it unduly prejudices the defendant Macdonald, and that it attempts to create in the minds of the jury that, because there might have been a corrupt transaction prior to this offense charged in the indictment, that of necessity the defendant was guilty of the offense charged.

"The Court: My view about this matter—and unless I revise it I shall so instruct the jury upon the point—is that, the question being whether the defendant on trial had guilty knowledge of the fact that the government was being defrauded by the use of a counterfeit stamp, I am of the opinion that

if, at the time stated in the offer of proof, he was party to a plan which was corrupt in its character to defraud the government by bribing an inspector, that may be shown in evidence and considered by the jury. the occurrence taking place in the same factory at which the transactions referred to in the indictment took place, upon the question of whether he had guilty knowledge of what was going on.

"Mr. Ham: Then I want an exception here, because it comes plainly within the Fish Case, which ruled against your honor on that point. I want an exception on the ground that one corrupt action, having no relation to the conspiracy charged, is of no probative value with relation to the matter on inquiry.

"The Court: It seems to me that the common sense of the thing is clear. It is plain on evidence that a counterfeit stamp was being used in April in the factory; and the only question is whether the defendant had knowledge, guilty knowledge, and was a guilty participant in that transaction. He says it was entirely without his knowledge; he had nothing to do with it and it was the work of inferior men. That is the issue we are trying here. Now, it is plain that, if it be a fact that within a few months preceding he was connected in a guilty way with an offer to corrupt a government inspector, that fact everybody would say—and say rightly—distinctly tended to the proposition that he had guilty knowledge here.

"Mr. Ham: But that has nothing to do, may it please your honor, with this contract. That was before.

"The Court: Oh, they both are related to cheating the government in the manufacture of shoes. I am against you on that, Mr. Ham."

Macdonald then testified that Collette was a government inspector, and, on an affirmative answer to his question as to whether the prosecuting officer wanted him to tell the whole story, stated at great length, in his own fashion, the dealings between Collette and himself—in brief, to the effect that Collette was a government inspector on an earlier contract; that after he had been for 90 days in that factory his allowance for expenses had been cut off; that he wanted to resign; that his work as an inspector on an earlier contract had been substantially completed; that Macdonald desired to hire Collette after he should complete his services with the government to help him get out a line of ladies' shoes; that, beginning about October 20, 1917, he had caused $10 per week to be paid to Collette under the name of Johnson, in addition to the $30 a week which Collette was at that time receiving from the government; that the payment was made in the name of Johnson because he (Macdonald) did not want his other employés to know until later that Collette was to be connected with the concern.

On redirect, without insisting on the exception taken at the opening of the cross-examination, Macdonald gave further evidence and at length as to the circumstances of his payments to Collette for a period of about 9 weeks prior to February 4, when Collette finally left the government employ. It was during exactly this period that, as Harrington testified and the jury must have found, the conspiracy to get bad leather by the other inspectors through the use of counterfeit stamps was concocted and put into effect.

Collette was called by the defendant as his next witness. Without any claim that the evidence was put in subject to the exception taken when Macdonald's payments to him were shown, he was examined at length by defendant's counsel as to his relations to Macdonald and

as to the circumstances surrounding these payments. He testified that he had been appointed inspector on June 15, 1917, for 3 months; that he was notified to come to Boston, where he got an allowance of $1 a day for 90 days for expenses; that this per diem was cut off on September 19; that he wrote the War Department asking to have his resignation accepted, as he could not live in Brockton and keep up his home in Philadelphia; that at that time practically all his work of inspection on the contract then in force had been completed; that about October 8 or 9 he had a talk with Macdonald, and told him of the trouble he was in as to his per diem, and that he wanted to resign; "that Macdonald said, 'Well, Mr. Collette, its very evident they want to keep you there until this contract is all completed and cleaned up;' to which witness replied, 'It evidently looks that way, for I couldn't imagine any other reason why they should not wish to let me go;' that Macdonald then said, 'Mr. Collette, I am not a man who would offer you a bribe, neither do I think you are a man that would receive a bribe;' to which witness replied, 'Mr. Macdonald, there isn't money enough in Brockton to bribe me.'" Macdonald said that until the government accepted Collette's resignation he would pay him $10 a week—the difference between $40 offered by Macdonald and Collette's pay from the government; that he received $10 a week from Thompson Bros. for 9 weeks, beginning on October 30; that after he was finally released from the government employ he went openly into the employ of Thompson Bros. in February, 1918.

He then testified in direct corroboration of Macdonald's evidence that on April 5 he saw three government inspectors looking at the bottoms of shoes; that Harrington came along and wanted to know what was the matter with the inspectors; that at that time he could not tell, but later during the day discovered there were impressions on the shoes which appeared to be different. When he made this discovery he went to the inspector, and Starr told him that there was a bogus stamp in the place; that the next day he told Macdonald that it was rumored about the factory that there was a bogus stamp in the place; that "Macdonald appeared surprised and asked him to go to inspector Phelan; that Phelan was not in, and at Macdonald's request he then went to Starr; that at that time he did not know there was a bogus stamp in the place."

On cross-examination, Collette said that, after talking with Inspector Starr, he reported to Macdonald that he had discovered what seemed to be a bogus stamp on the shoes. He corroborated Macdonald's testimony as to examination and removal of the shoes, which had, or seemed to have, the bogus stamp.

The defendant's fourth assignment of error is as follows:

"That the said District Court erred in allowing a district attorney to open up a matter not on trial for the purpose of prejudicing defendant, to wit, testimony concerning the relations of Collette with the defendant Macdonald, and the transactions between Collette and Macdonald prior to the contract mentioned in the indictment."

This in effect is a contention that the defendant was entitled to keep secret from the jury the relations between himself and his chief cor-

roborating witness.  Connected herewith, counsel urges consideration of a part of the ninth assignment of error, grounded upon the court's refusal to instruct the jury as follows:

"Even though you should find that the defendant Macdonald made payments of money to the witness Collette while he was a government inspector, and that such payments were made for an improper purpose, it is no evidence that the defendant Macdonald is guilty of the crime of which he is charged in this indictment."

This amounts to asserting that a contemporaneous bribing of one inspector has no tendency to prove guilty knowledge of the use of counterfeit stamps of unbribed inspectors.

In his charge to the jury, the District Judge said:

"The Collette evidence has this bearing: It is not at all on trial here whether Macdonald had a corrupt understanding with Collette or not in reference to Collette's inspection of the shoes under a preceding contract, but the question in this case before you whether Macdonald was an innocent or a knowing party to a plot that was being made to defraud the United States; if you find that shortly before the incidents here under consideration Macdonald was a knowing party to a corrupt understanding or corrupt transaction in reference to the inspection of shoes being made in the same factory for the United States under a different contract, but generally speaking the same kind of work, you may consider that fact as throwing light upon whether he was innocent or guilty in his knowledge of this transaction.  So that, without going further into details of the evidence, you are to take the whole case, all the evidence, every thing that assists you in determining this question of whether Mr Macdonald was or was not a party to this corrupt conspiracy—this charge against him.  You are then to determine whether you are satisfied beyond a reasonable doubt of his guilt."

After a conference at the bench, at the close of the charge, the following occurred:

"Mr. Ham: Mr. Fletcher has called my attention to the fact that he thinks I should save an exception to the allusion to the Collette evidence, so I will save that exception.

"The Court: Yes.

"The Court (to the jury): I perhaps ought to say one thing to you, gentlemen, in reference to the Collette evidence.  That has been argued to you by counsel on both sides, and I hesitated to pick out a special thing at this stage of the case, because it is very apt to throw it out of prospective (sic), and to give it an exaggerated and disproportionate importance; but, having cautioned you against that sort of thing, I think I should say to you that the gist of government's contention about Collette's evidence is that the United States officers did not know that he was taking other employment, or did not know of the arrangement made between him and Macdonald.

"If Collette told the United States officers, or if they understood and approved the arrangement between him and Macdonald, there would be nothing corrupt about it; but, if they did not, you might put a very different construction upon it, and whether they did or did not is, as I understand it, one of the questions which is in dispute and which you must decide."

On this record it is clear that the District Court held, in agreement with the defendant's counsel (twice expressed), that "the pinch of this case was the defendant's guilty knowledge" of the procurement and use of the counterfeit stamps, and that the evidence complained of was admitted on the ground that, if practically at the time that the counterfeit stamps were being used to avoid the results of inspection

by certain government inspectors, the defendant was a party to a corrupt plan to bribe another government inspector, such evidence might be considered by the jury in determining the question as to whether the defendant was innocent or guilty as to the procurement and use of the counterfeit stamps.

It must not be overlooked that the question of the relations between Macdonald and Collette came into the case first on cross-examination of Macdonald, who offered himself as a witness in his own behalf, and thereby of course waived his privilege as to self-crimination. 3 Wigmore's Ev. § 2276; Spies v. Ill., 123 U. S. 131, 180, 8 Sup. Ct. 21, 22, 31 L. Ed. 80; Fitzpatrick v. United States, 178 U. S. 304, 315, 20 Sup. Ct. 944, 44 L. Ed. 1078; Com. v. Morgan, 107 Mass. 199, 205; Com. v. Smith, 163 Mass. 411, 430 et seq., 40 N. E. 189, where some of the numerous cases are cited and reviewed.

Moreover, when the court made its first ruling admitting the evidence, it was clear that the case would (as it did) turn in large part in the minds of the jury upon the question of the credibility of Harrington and his wife on the government's side and Macdonald and Collette for the defense. This aspect of the case cannot be better put than in the language of the court's charge:

"Now, coming first to Macdonald, the case against him starts with the clear facts, some of which I have outlined to you, others of which will occur to you as having been clearly proved and as having significance upon the question of his knowledge. And then evidence of a direct character against him is offered by the witness Harrington, and the witness Mrs. Harrington. If you believe the testimony of Harrington, if you believe the testimony of Mrs. Harrington, you could hardly escape, I should suppose (although the question would still be for you to determine), the conclusion that Macdonald was a knowing party to the whole affair and was equally guilty with Harrington. Now, on the other side, Macdonald denies absolutely that he had any knowledge of the use of the stamps or their procurement, and he says that the testimony of Mr. and Mrs. Harrington, so far as they purport to relate conversations which he is said to have had in their presence or with them is entirely untrue. Well, not perhaps, gentlemen, entirely untrue, but that it is untrue in so far as it puts into his mouth or into his ears talk which implicates or informs him in a guilty way."

(1) I can conceive of no evidence more plainly within the proper limits of cross-examination than evidence of the relations between Macdonald and Collette, through whom Macdonald testified he obtained his first information of the fraudulent use of the counterfeit stamps. Macdonald's direct testimony plainly showed that he was intending to rely—as he did rely—on Collette as his chief corroborating witness. The relations between Macdonald and Collette—innocent or guilty, intimate or remote—were absolutely relevant. They were as competent as the relations of husband and wife between the Harringtons. The court wisely cautioned the jury, in weighing Mrs. Harrington's testimony, to consider her natural bias in favor of her husband. It is, to my mind, unthinkable that any jury should be required to determine the truth or falsity of the story told by Macdonald and Collette as to their surprised discovery of this fraud in early April, without having the relations between the two men fully probed on cross-examination. Manifestly, if Macdonald on cross-examination

could not be required to disclose when and under what circumstances he employed Collette, Collette on cross-examination would not be required or permitted to disclose that he, under an alias, had gone on Macdonald's pay roll in October, 1917. Assuming that the money payment was bribery—crime—Macdonald, the defendant, on taking the stand in his own behalf, had waived entirely his privilege in respect to any and all facts which tended to criminate him. See Commonwealth v. Smith, 163 Mass. 411, 433, 40 N. E. 189; Taylor on Evidence, § 1465. Collette, not being a party, might have had a right to refuse to answer questions which tended to criminate him. But he claimed no such privilege.

(2) Collette was put upon the stand by the defense, and examined fully as to all the facts and circumstances of his relations to Macdonald, without any claim on the part of the defendant that this evidence was offered subject to the objection and exception made when the subject-matter was first opened up on cross-examination of Macdonald. I find it impossible to believe that, under such circumstances, the error now assigned as to the admission of this evidence is properly before this court. I should suppose that the defendant had his option, either to stand on the exception taken when the court first ruled in the cross-examination of Macdonald, taking a like exception if and when, on cross-examination by the government, similar evidence was sought to be adduced from Collette, or to do what he did do—open up the whole subject-matter and seek to convince the jury that there was nothing wrongful and properly prejudicial in the relations between Macdonald and Collette. The rule, now adopted by the majority, that an excepting party may both have his exception to alleged incompetent evidence, and offer at length elaborate explanations of that evidence, is not, I think, consistent with sound practice and the orderly conduct of trials. Indeed, I think the examination of Macdonald alone, both on cross and on redirect, amounted to electing to stand his chances by explaining, thus waiving his right to an exception. How such exception could survive the evidence adduced by the defendant from Collette I cannot understand.

But, assuming that the defendant did not by conduct waive the objection taken when Macdonald was under cross-examination, I repeat that any cross-examination by the government which did not fully disclose to the jury the relations between Macdonald and his alleged first informant of the fraud upon the government, would have constituted a gross failure of duty on the part of the prosecuting attorney. The fact that the cross-examination of Macdonald and the subsequent volunteered evidence of Collette showed that the two might have been guilty of an independent crime, has no logical bearing upon the question of relevancy. The test of relevancy is not whether evidence is prejudicial or nonprejudicial, whether it shows crime or innocence. The proposition that evidence of one crime cannot be offered as evidence of another crime has, as pointed out by Mr. Wigmore (1 Wigmore's Ev. §§ 216, 305, 357), been at times so overextended as to exclude relevant evidence because it is prejudicial. On analysis, that is all there is in this case. The defendant's objections

to disclosing his relations to Collette are grounded, not on irrelevancy, but on their prejudicial character. But he took his chances as to those relations being prejudicial when he decided to ground his defense on his own testimony, buttressed by Collette's corroboration.

The defendant was not prejudiced by the District Court's limitation of the bearing of this evidence to guilty knowledge. The government rather than the defendant had cause to complain of this ruling.

(3) But, assuming that the evidence stands precisely as though it had been offered by the government as a part of its case in chief, I think it was plainly competent for the purpose for which the District Judge limited it. I am unable to agree with the majority that guilty knowledge was not in issue. I agree with the District Court that it was "the pinch of the case."

Possibly the fact that counsel for the government, as well as for the defendant, and the District Court, were, at the time of the original ruling, all agreed that guilty knowledge was the pinch of the case, is not conclusive on this court. Such complete agreement among all the actors at the trial clearly has great weight. But the same conclusion from the entire record seems to me to be irresistible. The defendant put into the case evidence as to the common use of stamps on civilian shoes, in order to meet a possible inference the jury might draw as to his knowing of the payment for those stamps, and as to the probability of his having seen them around in the factory. It was to this implied innocent knowledge that the trial judge obviously referred when he mentioned "guilty knowledge." Moreover, Johnson, having the fullest knowledge of the procurement of the counterfeit stamps, escaped because the jury found his knowledge was not guilty knowledge. The issue before the jury was therefore plainly whether Macdonald had not only knowledge, but actual and guilty knowledge, of the use of counterfeit stamps on inferior leather, for the purpose of defrauding the government.

The broad question was whether Macdonald was party to a conspiracy to defraud the government by palming off, through the use of counterfeit stamps, uninspected or rejected leather as inspected and approved leather. The evidence was that, almost contemporaneously with the expected beginning of work under the contract in question, an arrangement was made to pay, secretly and under an alias, money to Collette, then acting as a government inspector in that factory. It does not appear that at the time of this arrangement Collette and Macdonald did not expect that Collette might be detailed by the government to act for the government under the new contract. Obviously if, as the evidence warranted, the jury should find that Macdonald agreed to pay and did pay money to Collette with the expectation of influencing him in the performance of his duty under this contract, the evidence was admissible as part of one general plan and in order to show design. 1 Wigmore, Ev. §§ 304, 315; Com. v. Robinson, 146 Mass. 571, 16 N. E. 452.

Knowledge, design, and intent, all refer to a state of mind. Frequently they shade into each other by almost imperceptible gradations. Commonly they are provable by the same sort of evidence. See Mr.

Wigmore's discussion, 1 Wigmore on Evidence, § 300, and cross-references therein.

In this case the primary issue was whether Macdonald intended to defraud the United States, and for that purpose conspired with others to procure and use counterfeit stamps on inferior stock for army shoes. The fact that, as the trial developed, the procurement and use of the counterfeit stamps were no longer in dispute, did not change the essential nature of the issue. Macdonald's intent still remained the crucial problem. Of course, as the case developed, if he did not know of the fraudulent use, he did not intend the crime. Precisely so as to one charged with uttering counterfeit money; if he does not know that the money he passes is counterfeit, he does not intend the crime. But the gist of this case was whether Macdonald's state of mind towards the government and its inspection system was honest or dishonest. He contended that it was honest, and supported that claim by evidence of ignorance of the fraud done. In order to determine the real state of his mind, it was perfectly competent for the jury to consider whether at the same time, in the same place, with reference to the same sort of government undertaking, and perhaps to the same contract, he was a party to a scheme by another device to destroy the honesty and efficiency of the government's inspection system. If he intended, by bribing Collette, fraudulently to work poor materials into army shoes, the inference was perfectly sound and fair that he also intended, by counterfeiting the stamps of inspectors whom he had not bribed, to extend his field of successful fraud.

To make the evidence competent it was not necessary that the government should show that the two frauds—one by the use of counterfeit stamps, and the other by bribing an inspector—had application to the same contract. But the evidence plainly warranted the jury in finding that Macdonald bribed Collette, expecting he would, or might, be detailed for government service on the same contract under which the counterfeit stamps were used. But whether the possible bribery was proved as to the same or as to another contract, the evidence was competent as tending to show a purpose and design then and there by Macdonald to defraud the government by causing either by dishonest or by counterfeit inspection rejected or uninspected leather to be put into shoes as good and approved leather.

As Judge (later Mr. Justice) Brewer said in State v. Adams, 20 Kan. 311, 319:

"A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him."

Cf. State v. Folwell, 14 Kan. *105; People v. Tucker, 104 Cal. 440, 38 Pac. 195.

Compare, also, Moore v. United States, 150 U. S. 57, 61, 14 Sup. Ct. 26, 37 L. Ed. 996, where, under an indictment for murdering Palmer, evidence was admitted which tended to show that the defendant had also murdered Camp. The court said:

"The fact that the testimony also had a tendency to show that defendant had been guilty of Camp's murder would not be sufficient to exclude it, if it were

otherwise competent"—citing 1 Greenleaf on Ev. § 3; Farris v. People, 129 Ill. 521, 21 N. E. 821, 4 L. R. A. 582, 16 Am. St. Rep. 283; People v. Harris, 136 N. Y. 423, 33 N. E. 65.

In the last case—the Carlyle Harris Case, 136 N. Y. on page 449 et seq., 33 N. E. 65—the court, by Judge Gray, discusses and approves evidence tending to show the commission of other crimes far more remote from the offense in question than in the case at bar.

See, also, Thompson v. United States, 144 Fed. 14, 75 C. C. A. 172, 7 Ann. Cas. 62, for an able opinion by Judge Aldrich, sitting in this court with Judges Colt and Putnam, dealing with a similar question and citing many authorities. In that case (144 Fed. 20, 75 C. C. A. 172, 7 Ann. Cas. 62) is a pertinent discussion of the proper limits of cross-examination, when the defendant offers himself as a witness. See, also, Gallagher v. United States, 144 Fed. 87, 75 C. C. A. 245—a case of another defendant involved in the same transaction, where some similar questions are discussed by Judge Aldrich.

Putting the defendant's contention at its strongest, the evidence may by the jury have been construed to show that Macdonald was guilty of bribing a government inspector with relation to another contract for shoes than the one under which counterfeit stamps were used. Even so, the evidence was, in my view of the authorities, plainly competent. The two projects were cognate. They were not, fairly viewed, independent crimes. As the District Judge well said:

"* * * They both are related to cheating the government in the manufacture of shoes."

And it should not be overlooked that evidence of an independent crime is not excluded on the ground that it has no sound and logical probative effect as to the commission of another crime. Every one knows that if, in a collected group, pockets are picked and search is made for the criminal, if one previously convicted of picking pockets is found in the group, all minds instantly and properly move to the conviction that he is guilty of the crime in question. Judge Ladd pointed out this irresistible tendency in the Lapage Case, 57 N. H. 297, 300, 24 Am. Rep. 69. Such evidence of independent crime is under our Anglo-Saxon system excluded, because of our tenderness to the accused, because indictments do not warn defendants that they must meet charges of other crimes committed at other times and places, and because of the great practical danger of thus causing unfair trials. But when, as in this case, the defendant comes to court fully prepared to meet all of the government's contentions as to his relations with his chief corroborating witness, the evidence should be admitted and given its full probative force. None of the reasons for excluding such evidence are here applicable. It did not "tend to show that Macdonald had an evil disposition," etc., as the majority argue; but it did tend to show that he was then and there intending to cheat the government by getting around its inspection system.

(4) It would not be useful or appropriate for me to load down this already too long dissent with a review and analysis of the numerous cases dealing with this general subject. While much has been said,

very little has been added of value and illumination, since the discussion by counsel and court in State v. Lapage (1876) 57 N. H. 245, 24 Am. Rep. 69. In the notorious Molineux Case (1901) 168 N. Y. 264, 61 N. E. 286, the subject was exhaustively reviewed, and in 62 L. R. A. 193, is an elaborate note classifying and reviewing most of the cases.

No one doubts the general principle that evidence of distinct and unrelated crime committed by the defendant is not admissible, unless it falls within some of the numerous exceptions. The tendency of modern judicial decision has, I think, been towards extending the exceptions, and not the general rule. The protection of the innocent, and not the escape of the guilty, is increasingly recognized as the proper aim in excluding evidence. But if and when, as in this case, the evidence of another offense is closely related in time, nature, and general design, so that the defendant comes into court fully equipped with evidence and witnesses to meet the justly expected attack by the government, on no principle of sound logic or practical justice should the evidence be excluded.

After a fairly wide reading of the cases, old and modern, I can find no case in which the old technical rule has been given so wide an extension as in the majority opinion in the case at bar.

The evidence in this case is much more plainly admissible than that approved in the Lapage Case. The court there held that evidence that Lapage was, at about the time of the murder, frequenting the neighborhood and acting in a suspicious way with reference to other women than Josie Langmaid, with whose killing while attempting to commit rape he was on trial, was admissible as tending to show that he killed Josie Langmaid while attempting rape. Otherwise stated, evidence of a purpose to commit an independent crime at another, but closely related, time on other women, was held competent to show that he did commit this crime upon Josie Langmaid, because of the nearness and relation in time and nature of the crime committed to the contemplated crimes. But in that case evidence that more than four years before the trial, in a place in Canada, Lapage had actually committed rape upon another woman, was held incompetent. The vital distinction between the evidence admitted and the evidence excluded was that in the one case it was closely connected in time, place, and nature to the crime for which the defendant was being tried; whereas to put him on trial for the alleged rape four years before, in Canada, was, in effect, to try him for a crime for which he had never been indicted in accordance with the requirements of the Constitution.

The present case falls plainly within the rule of admissibility sustained in that leading case. Macdonald's (possible) bribery of Inspector Collette was closely related in time, nature, and general purpose with counterfeiting the stamps of other inspectors.

The case of Costelo v. Crowell, 139 Mass. 588, 2 N. E. 698, cited by the majority, has, on analysis, I think, no tendency to support their conclusion. In that case the defense to a suit on a promissory note dated July 31, 1868, was that the note was forged. In support of this contention a witness was asked whether he knew anything about the

plaintiff's making imitations of notes by tracing, and whether between the years of 1872 and 1875 the plaintiff had told him anything about making such imitations, and had shown him how he could make such imitations by means of a lamp and a table. This evidence was excluded. The plaintiff had a verdict; the court held this evidence properly excluded. The issue in the case was, as the court stated, not whether the plaintiff forged the note, but whether it was forged by any one. Evidence tending to show plaintiff's capacity for, or tendency toward, forging obviously would have opened all the evils of remote and collateral issues against which the general rule seeks to guard trials. The case bears no real resemblance to the instant case.

The Fish Case, 215 Fed. 544, 132 C. C. A. 56, L. R. A. 1915A, 809, was undoubtedly close to the line. But the present ruling goes far beyond the ruling in the Fish Case.

One of the latest rulings by this court on this point is in Coldwell v. United States, 256 Fed. 805, 168 C. C. A. 151, decided March 27, 1919. Coldwell was indicted under the Espionage Act of June 15, 1917,[1] for making statements on January 13, 1918, alleged to constitute an attempt to cause insubordination, etc., in the military and naval forces, etc. The District Court admitted circulars distributed by the defendant during the month of May, 1917, before the passage of the Espionage Act (40 Stat. 217), advising against registration. The admission of these circulars was assigned as error, but this court said by Judge Johnson:

"The court, however, correctly instructed the jury that they were received in evidence only for the purpose of showing the intent with which the defendant made the statements with which he was charged in the indictment under which he was being tried, and that whether the defendant could be punished for distributing these circulars urging a violation of a law which had not yet been enacted was not a question before the jury and about which they 'need not bother their heads.'"

It is to be observed that in the Coldwell Case the act was different in nature, and was separated from the act for which the defendant was being tried by a period of eight months; yet this court held that, on an indictment for what may broadly be called disloyal conduct in time of war, such evidence was competent for the jury to consider as bearing upon the defendant's intent as to obstructing the government's war activities. To hold valid the error assigned in this case, covering the Collette evidence, is to overrule the Coldwell Case, and to disregard a large number of other similar and much broader rulings made by other courts under the war statute prosecutions. Pass v. United States, 256 Fed. 731, 733, 168 C. C. A. 77; Galbreath v. United States, 257 Fed. 648, 658, 168 C. C. A. 598; Melanson v. United States, 256 Fed. 783, 786, 168 C. C. A. 129; Herman v. United States, 257 Fed. 601, 603, 168 C. C. A. 551; Kirchner v. United States, 255 Fed. 301, 305, 166 C. C. A. 471; Jelke v. United States, 255 Fed. 264, 284, 166 C. C. A. 434; Foster v. United States, 256 Fed. 207, 211, 167 C. C. A. 423. See, also, Jones v. United States, 162 Fed. 417, 427, 89 C. C. A. 303; Prettyman v. United States, 180 Fed. 30, 36, 103 C. C. A. 384; 12 Cyc. p. 408, and cases cited.

[1] Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 10212a–10212h.

Nor can the decision now made be reconciled with the decision and opinion of the court just rendered (March 23, 1920) in Nos. 1447, 1448, and 1449, Sears v. United States, 264 Fed. 257, —— C. C. A. ——. Sears was indicted for conspiracy to defraud the United States (and for bribing government inspectors) by putting into army shoes inferior leather for outer and inner soles. He was not indicted for fraud as to middle soles. Yet evidence was admitted that slit middle soles were also used, as bearing upon the defendant's intent to have bad outer and inner soles used. Otherwise stated: Evidence of an independent fraud, for which Sears might have been indicted (but was not), related in time, place, and circumstance with the fraud for which he was indicted, was held competent evidence as to his intent. The scholastic distinction between intent and knowledge undertaken to be made in these two cases has, in my view, no application, either in sound logic or in the administration of practical justice. If this court was right in the Sears Case, it is wrong in this case.

(5) Singularly enough, this decision—reverting to the most technical rules of the most scholastic period in the administration of our law— is made just after Congress has, after a long agitation for reform, enacted a statute intended to prevent such reversals on merely technical grounds. By the Act of February 26, 1919 (40 Stat. at Large, 1181 [Comp. St. Ann. Supp. 1919, § 1246]), section 269 of the judicial Code has been amended so as to read, the amended part being in italics, as follows:

"Sec. 269. All of the said courts shall have power to grant new trials, in cases where there has been a trial by jury, for reasons for which new trials have usually been granted in the courts of law. *On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties.*"

For the genesis of this attempted reform see—Report of the Standing Committee to Suggest Remedies and Propose Laws relating to Procedure, American Bar Association, July, 1919, p. 455; Procedural Reform in the Federal Courts, with Note Containing Summary of Analogous State Statutes, in 66 University of Pennsylvania Law Review; 33 Am. Bar Ass'n Rep. p. 542; Report of N. Y. Board of Statutory Consolidation and Simplification of Statutes of N. Y., vol. 1, p. 24, § 51, and page 218, § 48; 33 Harvard L. R. p. 236. Cf. Wigmore's Evidence, vol. 1, § 21, and Review, vol. 5, § 21.

As this statute deals with matters of evidence and procedure, it is applicable to this case, even although enacted subsequent to the commission of the alleged offense. Thompson v. Missouri, 171 U. S. 380, 18 Sup. Ct. 922, 43 L. Ed. 204; Mallett v. North Carolina, 181 U. S. 589, 592, 21 Sup. Ct. 730, 45 L. Ed. 1015; Gibson v. Mississippi, 162 U. S. 565, 585, 16 Sup. Ct. 904, 40 L. Ed. 1075; Duncan v. Missouri, 152 U. S. 377, 14 Sup. Ct. 570, 38 L. Ed. 485; Hopt v. Utah, 110 U. S. 574, 588, 4 Sup. Ct. 202, 28 L. Ed. 262; National Surety Co. v. Architectural Co., 226 U. S. 276, 283, 33 Sup. Ct. 17, 57 L. Ed. 221; Oshkosh Waterworks Co. v. Oshkosh, 187 U. S. 437,

439, 23 Sup. Ct. 234, 47 L. Ed. 249; New Orleans, C. & Lake R. R. v. State of Louisiana, 157 U. S. 219, 224, 15 Sup. Ct. 581, 39 L. Ed. 679.

The report to the House of Representatives as to this amendment contains the following statement:

"Whenever a verdict is set aside for a mere technical error that does not affect the merits an injustice is done that tends to bring the administration of law into disrepute and lessens the respect for law and order. A good cause or a meritorious defense seldom has to rely upon technicalities. It is the litigant who is in court to defeat such a cause of defense who resorts to technicalities. He seeks not justice, but the law. He does not try the merits of the case, but the methods by which the case is tried. It is to discourage that kind of trials and aid in securing cheaper and more certain and expeditious administration of justice that the passage of this bill is urged. The rule sought to be established by this bill has the approval of the bench and bar wherever it is in force, and is strongly urged by those who favor reform in our judicial system. The American Bar Association recommends this bill."

Macdonald had, in my confident opinion, a legal and eminently fair trial. The jury found him guilty. If they had believed his story of himself and Collette, they would have acquitted him. They were entitled to the benefit of the evidence of the relations between Macdonald and Collette, in order to determine their credibility, and thus reach a sound conclusion as to whether Macdonald had guilty knowledge of the fraud.

This court ought not, in my view, now to disregard both the spirit and the letter of this remedial statute.